Leonard **CAMPBELL et al., Plaintiffs,**

v.

Anderson **McGRUDER et al., Defendants.**

**Civ. A. No. 1462–71.**

United States District Court,
District of Columbia.

May 24, 1976.

J. Patrick Hickey, Public Defender Service, Washington, D. C., for plaintiffs.

Thomas R. Nedrich, Asst. Corp. Counsel, Washington, D. C., for defendants.

## PROCEEDINGS ON REMAND

BRYANT, District Judge.

I. Overcrowding.

On January 12, 1976, the United States Court of Appeals heard argument on cross-motions for summary affirmance and summary reversal of this Court's Interim Order of March 21, 1975, prohibiting overcrowding and for vacation of the stay of that Order entered by the Court of Appeals on April 4, 1975 and continued in effect since that time. According to the memorandum filed by the Court of Appeals, it was represented to the Court on that date that the Jail was then in compliance with the 48 square-feet per man requirement of this Court's original order and that there would be 240 spaces available for occupancy at the New Detention Facility by February 28, 1976 and another 240 by April 1, affording the prospect that further violations of plaintiffs' constitutional rights by overcrowding would not recur in the near future. ("Plaintiffs" is used herein to refer to both convicted and unconvicted residents. There are no significant differences in the manner in which they are treated by defendants.)

In mid-January, 1976, notwithstanding the above-mentioned representations, the D. C. Jail was again out of compliance with the 48 square-feet requirement and continued in that status into late April, 1976. Following a visit (unannounced) by this Court to the Jail on April 7, an order was issued setting the matter for hearing, held on April 29–30. It appears that compliance with the order was again achieved within days of the April 29 hearing. No prompt notice of the earlier overcrowding was given by the defendants to the Court or to counsel for plaintiffs.

During most of the period from mid-January to mid-April, more than 200 persons at a time were held in violation of this Court's March 1975 order, most of them double-housed in the 136 one-man cells in Cell Block 2, in the oldest and most dilapidated part of the Jail. Although some efforts were made to rotate these individuals into other housing locations at the Jail where, although 48 square feet was not available, there would be at least some ability to move about, the overcrowding of all parts of the Jail increased until this was no longer possible, with the result that some persons spent more than a month double-housed in CB–2.

Since January, 1976, the population of Detention Services has continued to rise. For male residents, the average daily population from February 8 through April 17, 1976 was 1080, but the population has gone as high as 1148 on particular days. (Although the Department continually changes its view of the capacity of the Jail at 48 square feet per man, the Court finds that 850 spaces was the capacity beyond which conditions at the Jail violate plaintiffs' constitutional rights. This total includes 272 cells in CB–1 and CB–2, currently vacant and unsafe for further use.)

During the aforementioned ten-week period, 2868 men were admitted to the Jail, approximately 60% categorized by the Department of Corrections as "New Admissions" and approximately 40% as "Recommits." The vast majority of New Admissions (approximately 80%), according to records of the Department, are persons

committed to custody by the courts, either in lieu of bond while awaiting trial or pursuant to a sentence of incarceration. Approximately 90–95% of the New Admissions committed by the courts are committed in lieu of bond. (In addition to those committed by the courts, the other groups included in the New Admissions category are illegal aliens arrested by the Immigration and Naturalization Service, persons committed by order of the United States Marshal, and persons held on writs of habeas corpus ad prosequendum or ad testificandum.)

Perhaps more significant is the fact that of those New Admissions who were received from the courts, 90–95% of whom (as previously stated) were in a pre-trial status, approximately half were persons charged with misdemeanor offenses, confined in lieu of bail. While the weekly summaries prepared by the Department of Corrections of admissions during this ten-week period include persons charged with robbery, homicide, burglary and other serious felonies, the number of persons committed as a result of charges for such relatively minor offenses as tampering with an auto, attempted petit larceny, destroying property, etc. is striking. Indeed, during the ten-week period studied, 140 individuals were committed for traffic offenses.

For those persons held at the Jail awaiting Superior Court trials, approximately twelve weeks intervene between initial arraignment and trial if the charge is a misdemeanor. If the defendant is charged with a felony, more than seven weeks will elapse between arrest and indictment, followed by eight to ten weeks before conviction, acquittal or dismissal, and an additional four weeks for sentencing for those who are convicted.

The "Recommit" category, the source of approximately 40% of the admissions to the Jail, are all sentenced individuals who are held at the Jail almost exclusively because of the administrative decisions and priorities of the Department of Corrections. (A small number in this class is held because of specific court order, usually founded on concern for the individual's safety if housed at the Lorton Correctional Complex.) No reasons, apart from the Department's and the City's funding priorities, exist to justify or require continued housing of most of these individuals at the Jail.

In early April, 1976, the first inmates were housed in the New Detention Facility (NDF) of the Department of Corrections. The NDF consists of two "modules" for housing inmates, the North Module and the South Module. Each module has 480 one-man cells, arranged in six cell blocks of 80 cells each. The total capacity of NDF will be 960 inmates. Three cell blocks in the North Module were turned over by the builder to the Department about the first week of March. Following inspections and "shakedown" procedures, the first inmates were moved in during the first week of April, and have continued to move in since that time as cells became available. On April 29, 1976, there were slightly over 300 men in the NDF, with the Department predicting a population there of 450–480 by the end of the first week of May.

The District's Department of General Services supervises the performance by the builder of the construction contract for NDF, and a representative of that Department testified that the South Module (480 cells) would be available for "joint occupancy" about June 30, 1976. "Joint occupancy" refers to a period when both the builder and the Department of Corrections are working at the site, inspecting the construction and repairing defects. Inmates will not be housed at the South Module during the "joint occupancy" period. In light of the experience with the North Module, it may well be August before the first inmates move into the South Module, and the end of the summer before the full complement of 960 spaces are available for housing inmates.

As of April 30, there were 1243 males housed in Detention Services (865 at the old Jail, 378 at the NDF). Because the NDF, even if it were available today, is inadequate to house the male prisoners, the Department plans to continue to use a portion of the facilities at the old Jail. Department

officials testified that they will utilize Cell Blocks 3 and 4 of the Jail, which have a capacity of 376 under the 48 square-foot standard. It is also possible that the Dormitory facilities at the old Jail (capacity 201) will be used, but the prospects for sufficient staff to operate the Dormitory facilities are not good. If sufficient staff is unavailable, inmates will be crowded into Cell Blocks 3 and 4. Indeed, no firm assurances of necessary staff to operate even the NDF to its designed capacity are available, since the budget containing those positions has not yet been approved by the Congress. Moreover, reductions in the proposed budget have required that the Department utilize inmate labor ("Captain's Detail") to operate the NDF, although some Corrections officials view such a practice as undesirable.

The cells in CB–1 and CB–2 at the Jail (total 272 cells) will not be used because of their extreme condition of deterioration and structural damage to that part of the Jail which renders them unsafe. Economical repair is not feasible. Funds have been reprogrammed by the Department of Corrections to seal off CB–1, CB–2 and the Rotunda visiting area from the remainder of the Jail. Funding to renovate CB–3 and CB–4 to bring them into compliance with minimal housing standards has not been approved, and, if approved, will be hampered by the high population which prevents vacating those cell blocks for the renovation period.

The Women's Detention Center is also substantially overcrowded, and the Department plans to house women in the NDF. While a final decision concerning the number of women to be housed at NDF has not been made, at least 80 and perhaps as many as 160 women will be housed there. This has the obvious effect of reducing the male capacity of NDF to 800–880. Assuming that only 80 spaces are reserved for female prisoners at NDF, the male capacity of Detention Services, when NDF is fully operational, will be 1256 (880 at NDF and 376 at the old Jail). If 160 spaces at NDF are used for women, the male capacity is 1176. On April 30, the male population was 1243.

On the same date, 138 women were crowded into the Women's Detention Center (capacity—50).

The Department of Corrections has experienced difficulties in attempting to project future populations for Detention Services, in part because of its inability to know the future arrest rates of the Metropolitan Police and the bail-setting policies of the courts. Statistical predictions which have been made in the past by the Department's Office of Planning have consistently underestimated, by nearly one-third, the actual Detention Services population. Using those same methods and data base, the Department in the fall of 1975 projected a Detention Services population (including women) rising to 1300 for spring, 1977. In fact, that projection has already been exceeded in April, 1976 (1243 males + 138 females = 1381). In addition, several witnesses, including the Department's Director, expect that the rising population trend, evident in the first four months of 1976, will continue at least throughout this year, and the prior experience of these officials has also shown a tendency for the population to increase during the summer months just ahead. If this trend and past experience continue to hold true, and all indications are that they will, the unmistakable conclusion is that notwithstanding the opening of the NDF, the Jail facilities will continue to be overcrowded, and plaintiffs will continue to be housed in violation of their constitutional rights and elemental standards of human decency.

Notwithstanding the present crisis and the appalling prospects of a worsening situation, there has been no planning for dealing with this problem by the City or the Department. Rather, the tedious history of this litigation reflects only occasional and sporadic efforts, usually when a court proceeding has been scheduled, followed by almost total inactivity once the matter is no longer before the Court as a crisis situation. (See, e. g., the discussion of the "demountable" housing units, infra.) Mr. Jackson, the Department's Director, expressed concern in November 1975 about whether "the re-

quired aggressive and productive action" had been taken by his staff to alleviate overcrowding. He designated yet another individual to monitor the Department's efforts, but the defendants did not present either the testimony of this individual or any evidence concerning his efforts at the April 29–30 hearings. At those hearings, as in earlier proceedings, it became evident that more energy is devoted to pointing up excuses than to creative efforts to deal effectively with a problem which obviously is here and is not going away of its own accord—the new Jail notwithstanding.

This Court's skepticism concerning the Department's protestations of the impossibility of compliance urged on this Court and the Court of Appeals almost from the moment the original order of March 21, 1975 was entered, has been confirmed and heightened by the events of the intervening year. Throughout these proceedings, when pressure was brought to bear, the impossible has become possible and compliance has been obtained, at least for a time. What has been missing, unfortunately, is a commitment to a long-range, continuing effort to maximize the resources presently available to the Department and the City, and to make plans to increase those resources to meet the need.

The Court and counsel for the plaintiffs cannot be aware of all the alternatives open to the Department and the City, and orders to date have left to the latter parties the methods of complying with the Court's mandate. For example, the availability of cell blocks, unused though in need of repair, at the Department of Human Resources' facility for alcoholics at Occoquan (adjacent to the Corrections Department's Minimum Security facility) was not known to the Court or counsel in March, 1975 when the Department's Director said compliance was impossible. Their existence was, however, known to Corrections officials. In November, 1975 a request was made, and promptly granted, for transfer of those facilities from the Department of Human Resources to the Department of Corrections. However, at the time of the April 29 hearing, the reno-

vation work (to be performed by the Department) had not begun and was not yet scheduled. Other alternatives, suggested to and recognized by the Department, and some of which were the subject of promises by the Department to pursue their utilization, have not been pursued, though they remain open as options.

A. Lorton Youth Centers 1 and 2, the subject of population limits imposed by Judge Gesell, contain additional adequate housing space. Despite assurances to the contrary, no approach has been made to Judge Gesell to seek his authorization to increase the population limits. Instead, persons who have been held at the Youth Centers for diagnostic studies pursuant to 18 U.S.C. § 5010(e) are returned to the Jail, increasing the population there, to avoid violation of the population limits set by Judge Gesell.

B. During the period following completion of § 5010(e) studies in Youth Act cases, and prior to the imposition of sentence, defendants are held at the D. C. Jail. The Department claims that holding these defendants at the Adult Facility at Lorton, where some of them will ultimately be sentenced to serve their time, would be inappropriate since the Adult Facility houses sentenced adult felons and is not certified by the Attorney General as a Youth Facility. Of course, the D. C. Jail is likewise not certified as a Youth Facility, and it also houses sentenced adult felons. Even under the dubious construction that § 5010(e) commitment orders authorize holding defendants at the Jail but not at the Adult Facility, no effort has been made to request judges to authorize (at least for those for whom Youth Act sentences are not recommended) holding these persons at the Adult Facility.

C. The Minimum Security Facility at Lorton continues to operate, as it has throughout this litigation, under capacity. Notwithstanding the fact that it houses almost exclusively persons serving felony sentences (including homicides and other serious crimes), the Department contends that the absence of a fence around the facility

makes it inappropriate for housing sentenced misdemeanants because of "security" considerations. The facility was previously used for sentenced misdemeanants, and several Jail officials have testified that they know of no reason why these defendants should not again be housed there. Defendant McGruder recommended several years ago that misdemeanants be transferred to Lorton to alleviate the overcrowding at the Jail. In sum, the evidence simply does not support the Department's claim that holding sentenced misdemeanants at the Jail is necessary for "security" reasons.

D. Some misdemeanants are sentenced by judges to serve their time in the Department's Community Correctional Centers (sometimes called "half-way houses"), but, if this sentence is not imposed, the Department has the authority (D.C.Code § 24–462) to recommend such a sentence to the court. While the Department has made about six such recommendations per month over the past ten months (about half of which were accepted by the courts), they do not make such recommendations for all misdemeanants. Excluded are those with short sentences, because the Department views the length of the sentence as inadequate to "process" such a recommendation. Finally, if the Department, presumably confident that half-way house confinement will not unduly endanger the community, recommends such confinement but the recommendation is rejected by the court, the Department assumes that the defendants thereby become unsuitable for confinement in Fairfax County at the Minimum Security facility.

E. In February, 1976, the Department wrote to the United States Marshal concerning the removal from the Jail of parole violators under the supervision of the United States Parole Board. (A similar letter was written in April, 1975.) One month later the Parole Board responded, revealing that some of the individuals involved had been designated to Federal Bureau of Prisons institutions as far back as October, 1975, but were still awaiting transportation. No other correspondence or any substantial efforts to speed up this process were shown.

F. In August, 1975, the Department had available and considered the use of "demountable" housing units, temporary housing facilities owned by the District of Columbia. Instead, the Department decided to renovate a dormitory area at the Jail. (Here again, funds for renovation which were "unavailable" in May became available in August, through an executive decision of the City.) When the population again began to rise, however, no further efforts were made to obtain or utilize demountables, although some have been used at Lorton for office facilities. Several other state corrections departments have increased their housing capacities through use of these units, obtained either free or at minimal cost from agencies of the United States, including the Department of Housing and Urban Development and the Law Enforcement Assistance Administration. Such units are still available to the City.

G. The Department contends that 18 U.S.C. § 4083 prevents the housing of convicted misdemeanants at the Maximum Security or Central Facilities at Lorton, because the latter institutions are "penitentiaries" within the meaning of that section. Whether such a provision might be superseded by the authorization in D.C.Code § 24–425 and regulations thereunder authorizing the Director of the Department to transfer prisoners "to relieve overcrowding," the U.S.C. provision clearly does not prohibit such a transfer with the misdemeanant's consent. The Department does not, however, request such consent, but continues to hold all sentenced misdemeanants at the Jail.

H. Some defendants are sentenced by judges to serve sentences of confinement on weekends only. In April, 1975, the Department wrote to these judges requesting permission to transfer such inmates to half-way houses to relieve overcrowding at the Jail. Although this effort was generally successful, no similar efforts have been made since that time.

I. Some defendants sentenced by Superior Court judges are recommended by those judges for designation to a Federal Bureau of Prisons institution for service of sentence. Such recommendations are not binding, and are usually rejected by the Bureau, in which event the inmate serves his time at Lorton. Nevertheless, the Department continues to hold sentenced Superior Court felons at the Jail while awaiting the Bureau of Prisons' response to the recommendation.

J. No substantial efforts have been made by the Department to locate alternative housing facilities within the District of Columbia or at the Lorton Complex. The Department's view apparently is that no existing facility is adequate (including vacant spaces previously used for housing such as Junior Village or Bolling Air Force Base) because the buildings are not built as jails and therefore "security" would prevent utilization of such facilities. Mr. McGruder, the former superintendent of the Jail, felt that only a small proportion of the Jail population with which he was so familiar required maximum security custody, and the notion that many of the sentenced misdemeanants, whose presence adds substantially to the overcrowding at the Jail, cannot safely be held in less secure facilities has never been satisfactorily explained by the Department. (One "explanation," that nearly all sentenced misdemeanants have pending felony charges or outstanding detainers, has been eliminated by the Department's records reflecting that less than half the sentenced misdemeanants fall into these categories.) In addition, additional space is available at the Central Facility at Lorton, where some maximum security ("close custody") inmates live in dormitories with more than 80 square feet per man.

██ The above-listed alternatives, as well as others, make clear that the defendants have failed to take reasonable and obvious steps to alleviate overcrowding. While these steps may not be sufficient to eliminate completely the likelihood of further constitutional violations, they would, if tak-

en, reduce that prospect for a while and increase the capacity of the inmate population which the defendants can constitutionally confine.

██ All efforts to induce the defendants to put their house in order have been unavailing up to now, and it is apparent that no meaningful effort can reasonably be expected absent a strong order of the Court which makes clear that housing inmates under unconstitutional conditions must cease. Such an order should be designed to sensitize the defendants to the fact that their overcrowding crisis point which requires immediate action is when they go one inmate over capacity, rather than when the Court is made aware of widespread overcrowding and orders a hearing.

Accordingly, this Court believes that the defendants should be enjoined from housing after June 1, 1976 more than 960 persons at the New Detention Facility, 215 persons in Cell Block 4, 161 persons in Cell Block 3, 110 persons in Dormitory 1, and 91 persons in Dormitory 2 at the old Jail. In addition, after July 1, 1976 no persons should be housed in Cell Blocks 1 and 2 at the old Jail.

Finally, it is the opinion of the Court that the order should also contain the proviso that if compliance requires a reduction in the inmate population at either facility, and other efforts to reduce the population are not successful within 48 hours after compliance ceases, the Director of the Department of Corrections and the Superintendent of Detention Services be directed to release on their own recognizance, within 48 hours of the admission to either facility of persons in excess of the numbers stated in the preceding paragraph, those pre-trial detainees held in default of the lowest amount of bail, and among those detainees held in the same amount of bail those held for the longest time, until compliance with that Order is obtained; provided that if the Board of Judges of the Superior Court, or the Chief Judge thereof, specify a different method of selecting the persons to be released, the defendants shall be governed accordingly. The Court would also order that the defendants submit to the Court and serve on op-

posing counsel within 45 days their plan to reduce the population and/or increase the facilities available to house committed persons so that future overcrowding may be avoided.

## II. Recreation.

On April 29 and 30, 1976, the Court heard evidence concerning recreation for maximum security prisoners at both the new and old District of Columbia Jails. In response to the mandate of the Court of Appeals, the Court finds as follows:

1) No evidence was presented to the Court as to any dangers or risks involved in providing outside recreation to maximum security prisoners. In fact, at least two of defendants' agents testified that outside recreation for maximum security prisoners was possible. George Holland, administrator of the new jail, testified that recreation for maximum security prisoners was not a security problem but a matter of developing the appropriate schedules.

2) Moreover there was no evidence presented which would indicate that defendants do not have the personnel or facilities to provide outdoor exercise to prisoners held in maximum security.

3) On the average there are 136 prisoners on deadlock at the District of Columbia Jail. Of that number Department of Corrections officials estimate that 60 to 65 percent are pre-trial prisoners, five to ten percent are convicted prisoners awaiting sentencing, and 25 to 35 percent are sentenced prisoners. Department of Corrections officials also estimate that 20 percent of the prisoners held in deadlock are there by court order, 70 percent are there for their own protection, five percent are there at the prosecuting attorney's request, and one to ten percent are there as a result of disciplinary procedures instituted by the jail officials.

4) On the average, pre-trial maximum security prisoners who are charged with felonies in Superior Court spend eight to ten weeks in jail prior to their trial, and an average of four weeks between conviction

and sentencing. Prisoners charged with felonies and tried in District Court spend an average of eight to ten weeks between conviction and sentencing. Prisoners charged with misdemeanors and tried in Superior Court stay in jail an average of twelve weeks prior to trial and two weeks between conviction and sentencing. (These statistics are based on court records and are applicable to all prisoners.) The Department of Corrections is unable to determine how long sentenced prisoners remain in maximum security.

5) Prisoners in orientation at Lorton get outside recreation three times a day three days a week and twice a day two days a week.

6) Maximum security prisoners at Lorton receive one hour of outdoor exercise five days a week.

7) At the old Jail maximum security prisoners are not receiving any outdoor exercise.

8) Juveniles at the District of Columbia Jail now receive one hour of outdoor exercise daily. This new practice will continue to be the policy in the future.

9) The new jail has facilities for both indoor and outdoor exercise for all prisoners. Maximum security prisoners at the new jail are presently getting one-half hour of indoor exercise daily. The administrator of the new jail is presently developing recreation plans for the new jail and intends to give maximum security prisoners at that facility outdoor exercise.

Accordingly, it is by the Court this 24th day of May, 1976,

ORDERED that, there being no just reason for delay, the Clerk enter partial final judgment pursuant to F.R.C.P. 54(b); that a certified copy of this Memorandum and Order, constituting the Court's findings of fact and conclusions of law, be forthwith transmitted to the United States Court of Appeals as a supplemental record on appeal; and that this Court retain jurisdiction for the purpose of implementation of this ORDER. Dated: May 24, 1976.