UNITED STATES of America, Plaintiff,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

Civ. A. No. 88–2897.

United States District Court, District of Columbia.

Nov. 10, 1988.

John D. Bates, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Paul Quander, Corp. Counsel's Office, for District of Columbia, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

In this action for permanent injunctive relief and declaratory judgment, the United States of America seeks to enjoin the District of Columbia; Marion S. Barry, Jr., Mayor of the District of Columbia; William Plaut, Administrator of the District of Columbia Jail; and Hallem H. Williams, Jr., Director of the District of Columbia Department of Corrections, from refusing to accept into the District of Columbia Jail, or any other District of Columbia Department of Corrections facility, prisoners who have been sentenced by the Superior Court of the District of Columbia.

On October 4, 1988, the District of Columbia announced that it would no longer accept newly sentenced prisoners into the District of Columbia Department of Corrections. The District undertook this extraordinary action in response to two federal court orders issued on September 29, 1988. In the first order, Judge William Bryant ruled that the 1,694 inmate population ceiling at the District of Columbia Jail may not be exceeded. *Campbell v. McGruder,* Civil Action No. 71–1462 (D.D.C.). In the second order, the U.S. Court of Appeals for the District of Columbia lifted a stay of, and thereby affirmed, the August 1, 1988 order of Judge June Green requiring, *inter alia,* the District to cease transferring inmates to the Central Facility at Lorton until the population of Central returns to the 1,166 inmate population ceiling set by a consent decree. *Twelve John Does v. District of Columbia,* D.C. Civil Action No. 80–2136.

The District's alarming response to the recent Court orders represents the unfortunate culmination of a prison crisis that has plagued the District of Columbia, the Federal Bureau of Prisons, and the federal courts in the District of Columbia for decades. By literally barring the jail-house doors, the District has finally forced the United States to bring to this Court the ultimate issue of identifying the locus of responsibility for housing adult male prisoners sentenced by the Superior Court of the District of Columbia.

The United States filed its complaint for declaratory and injunctive relief and its motions for a temporary restraining order and for a preliminary injunction on October 6, 1988. After an emergency hearing, the Court denied plaintiff's motion for a temporary restraining order. On October 12, 1988, plaintiff moved for consolidation of the hearing on the preliminary injunction with the trial on the merits, pursuant to Fed.R.Civ.P. 65(a)(2), and amended its pleadings to seek a permanent injunction. The Court granted plaintiff's motion pursuant to its bench opinion of October 17, 1988.

To obtain equitable relief in the present action, the United States must succeed on the merits and show that it is threatened with harm for which it has no adequate remedy at law. *Reed Enterprises v. Corcoran,* 354 F.2d 519, 522 (D.C.Cir.1965); 11 C. Wright, A. Miller, Federal Practice and Procedure § 2942, at 368–69 (1973). Since October 3, 1988, the United States has accepted over 200 D.C. prisoners into federal prisons, eight of whose sentences have already expired. The prospective infusion of similar numbers of prisoners *ad infinitum* into a federal prison system that is currently operating at 157% of design capacity (as compared to the District system which is currently operating at 114% of design capacity) clearly constitutes threatened injury for which the United States has no adequate remedy at law.

The Court's current inquiry thus focuses on the merits of the case. That is, under D.C.Code § 24–425, must the District continue to accept and provide for prisoners duly designated by the Attorney General to the District of Columbia Department of Corrections; or must the Attorney General house and maintain D.C. prisoners, for some indefinite period of time, upon the District's unilateral refusal to accept properly assigned prisoners into its facilities. It is the decision of this Court that under D.C.Code § 24–425: (1) the District of Columbia must continue to accept and main-

tain prisoners duly designated by the Attorney General to the District of Columbia Department of Corrections, provided that such designation would not cause the D.C. facilities to exceed population limits set by the United States District Court; (2) the Attorney General must retain custody of said prisoners whenever all facilities within the District of Columbia Department of Corrections meet or exceed the court ordered population caps such that no facility exists within the District of Columbia to serve as an available, suitable, and appropriate place of confinement; and (3) the District of Columbia must immediately undertake all feasible measures to provide space for all adult male prisoners sentenced hereafter by the Superior Court.

## BACKGROUND

In an effort to bring some cohesion to the byzantine labyrinth of the recurrent prison problem and resultant litigation, the Court has reviewed the extensive court records, consultant reports, opinions, and orders in prior related actions. A brief historical overview of the District of Columbia's chronic prison problem sheds light on the parties' conflicting statutory interpretations and places the current crisis in context.

The District of Columbia's correctional facilities have been the subject of public and judicial scrutiny for over 150 years. *See, e.g.,* S. McConville, *A Review of the Correctional Policies of the District of Columbia* 1 (1986) (surveying the overcrowding and dilapidated conditions in the District's prisons and Jail from 1825 through 1986). During the past two decades, the federal courts in the District of Columbia have heard several ongoing class actions challenging the overcrowding and deteriorating conditions at the various institutions comprising the District of Columbia Department of Corrections. The suits have been marked with repeated judicial orders, consent decrees, and contempt citations exposing the District's mismanagement of its prison system and attempting to compel the District's compliance with laws, court orders, and consent decrees.

As chronicled by Judges Bryant and Green, at the root of the most recent suits is the District's intransigent refusal adequately and expeditiously to expand its prison capacity. Over ten years ago, Judge Bryant listed the litany of constitutional abuses at the old D.C. Jail including overcrowding, integration of sentenced and unsentenced residents, lack of classification programs for determining the level of security needed for unsentenced residents, and numerous violations of building codes, plumbing codes, housing regulations, health regulations, food regulations, and fire codes. *Campbell v. McGruder,* 416 F.Supp. 100 (D.D.C.1975). Yet, despite the Court's findings and subsequent orders, the deplorable conditions persisted. Six months after his ruling, Judge Bryant found that "defendants have failed to take reasonable and obvious steps to alleviate overcrowding." *Campbell v. McGruder,* 416 F.Supp. 111 (D.D.C.1976). Nine years later, despite the construction of a new D.C. Jail, Judge Bryant was forced to conclude that the District's cavalier attitude still had not changed:

> Time and time again, defendants have requested the court to defer to their accumulated wisdom, to stay its hand, to give them more time. Time and again, these requests have been honored in the hope and expectation that defendants would solve these problems expeditiously and effectively. However, *instead of matters improving they have deteriorated.*

*Campbell v. McGruder,* Civil Action No. 71–1462, Memorandum and Order at 50 (D.D.C. July 15, 1985) (emphasis added). *See generally* S. McConville, *A Review of the Correctional Policies of the District of Columbia* 33–44 (1986) (detailing the "damming and disturbing list of deficiencies" in the D.C. Jail, including gross overcrowding, unhygienic and inadequate washing and sanitary facilities, lighting and vent difficulties, rodent and insect infestation, and deficient medical and dental care).

In response to the District's failure to address the overcrowding crisis of its own accord, Judge Bryant established the first cap on the D.C. Jail. Through a consent

decree, Judge Bryant set a 1,694 inmate limit to the Jail's population. In view of facts indicating that, with the exception of short daily periods when prisoners were counted, the District had consistently exceeded the 1,694 inmate ceiling, Judge Bryant subsequently entered an oral order on September 29, 1988, requiring the District to comply, in spirit and in fact, with the actual cap of 1,694 at the D.C. Jail. *Campbell v. McGruder*, Civil Action No. 71–1462 (D.D.C.).

The recent litigation involving the District's Central Facility at Lorton reveals a similarly bleak cycle of dismal conditions, disregarded court decrees, and duplicative contempt citations. On August 1, 1988, the interminable overcrowding, fires, and riots at Central lead Judge June Green to order a population cap on the prison. *Twelve John Does v. District of Columbia*, Civil Action No. 80–2136 (D.D.C.). Judge June Green ordered, *inter alia*, (1) that no additional inmates be admitted to the District of Columbia's Central Facility at Lorton after August 8, 1988, (2) that by September 1, 1988, the population at Central must be reduced by at least 150 inmates, and (3) that the population at Central must be reduced every 30 days thereafter by at least 150 inmates until the population reaches 1,166 inmates, the ceiling imposed upon Central under a 1982 consent decree. That order was promptly stayed pending appeal by the Court of Appeals. On September 29, 1988, however, following full briefing and argument, the Court of Appeals vacated the stay and affirmed Judge Green's order.

Over the past decade, the federal government has made abundant efforts to help the District alleviate its prison crisis. The Attorney General has persuaded Congress to obtain funding appropriated for new District prison facilities, located and tendered federal sites within the District for a new prison, and provided the District with a sophisticated analysis of modular facilities vendors and offered the District the technical assistance necessary to place the modular facilities on appropriate sites. Memorandum of Points and Authorities in Support of Plaintiff's Motions for Temporary Restraining Order and for Preliminary Injunction, exhibits A, B, and J.

In addition, when faced with the District's unresponsiveness to the overcrowding crisis and numerous court orders, the Attorney General has, on occasion, temporarily ceased designating the District's correctional facilities as places of confinement for prisoners convicted in Superior Court and designated federal prisons in their place. On August 21, 1985, acting pursuant to D.C.Code § 24–425, the Deputy Attorney General advised the Mayor that, as an *interim solution*, the Attorney General would designate federal prisons for all the District's sentenced prisoners.[1] The Government's offer of assistance was conditioned upon the District's *immediate* construction of modular facilities and its taking all other necessary steps to relieve the crisis. *Id.*, exhibit B. Five months later, when the District had failed to fulfill its promises, the Deputy Attorney General announced that the Department of Justice would stop taking all D.C. prisoners into federal custody. Nevertheless, after the July, 1986 riot at Occoquan, the Attorney General again came to the District's rescue and took 300 D.C. prisoners into federal facilities.

The District's response to the federal government's multiple efforts has been dilatory at best.[2] First, despite the appropria-

---

1. From August 21, 1985 until January 13, 1986, the Bureau of Prisons took into federal custody *every* prisoner sentenced in the Superior Court, a total of 1,589 prisoners. Combined with the number of D.C. prisoners already in federal custody, the resulting number of prisoners in the Federal Bureau of Prisons totaled 2,376 as of January 13, 1986. Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction, exhibit B.

2. In his August 4, 1988 letter to Mayor Barry, D.C. Department of Corrections Director Hallem H. Williams Jr. reviews the strategies the Department has adopted to "deal with chronic crowding," including: (1) increasing the Department budget by 262 percent; (2) applying for (but failing to receive) $45 million from Congress to construct an additional 800–bed medium security facility at Lorton; (3) releasing prisoners early pursuant to the Prison Overcrowding Emergency Powers Act; and (4) find-

tion of funding to build new prison facilities in 1986, the District anticipates that it will be years before new facilities are completed. Second, the District has steadfastly refused to take the obvious emergency measure of placing on vacant sites within the District modular facilities to provide temporary accommodations for excess prison populations. Third, the District has failed to utilize adequately such available measures as contracting out with public or private facilities or housing prisoners at other secure facilities in the District such as Saint Elizabeths Hospital. *See id.,* exhibit H; *see also id.,* exhibit B (noting the District's lack of "parallel effort" to alleviate the overcrowding crisis). Finally, despite the District's absolute and unequivocal admission of responsibility for housing all D.C.Code violators,[3] the Mayor has periodically denied his responsibility and threatened to stop housing D.C. prisoners.[4]

It is in light of this history of the District's lax effort to deal effectively with its two-decade-old prison crisis that the current action must be viewed. In a calculated attempt to "comply" with Judge Bryant's and Judge Green's population caps, the District has now locked its prison doors, flagrantly reneging on its agreement with the Attorney General to solve responsibly the District's overcrowding crisis by expanding its facilities. The District now maintains that, pursuant to D.C.Code § 24–425, the Attorney General must assume physical custody of, and provide long-term housing for, the prisoners designated

to D.C. facilities whom the District turns away. The United States counters that, pursuant to the same D.C.Code section, responsibility lies with the District to house the prisoners in District facilities, whether or not they exceed court-ordered population caps, and to utilize District resources to establish emergency relief. It is to the resulting conflicting interpretations and applications of D.C.Code § 24–425 that the Court now turns.

## DISCUSSION

In interpreting D.C.Code § 24–425, plaintiff and defendants derive diametrically opposed doctrines from the language of the statute. D.C.Code § 24–425 provides that:

All prisoners convicted in the District of Columbia for any offense, including violations of municipal regulations and ordinances and acts of Congress in the nature of municipal regulations and ordinances, shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether

---

ing out-of-state housing for inmates. Nevertheless, by the Director's own admission, "[w]hile these strategies have been helpful, none has had a dramatic or long lasting impact on population growth." *Defendants' Reply to Plaintiff's Supplemental Memorandum,* attached August 4, 1988 letter to Mayor Marion Barry Jr. from Hallem H. Williams, Jr. at 2–3.

**3.** In a letter to the Honorable Edwin A. Meese III, dated July 11, 1986, Mayor Marion S. Barry stated that "the District of Columbia agrees to insure that space is available in the future to house all D.C.Code violators who are transported to the D.C. Jail from the Superior Court." *Id.,* exhibit D.

**4.** Mayor Barry told *The Washington Post* that "[e]very sentenced prisoner is the property of Edwin Meese. We are just being nice and generous by taking Edwin Meese's property." *The*

*Washington Post,* August 22, 1985, Cl, col. 5, *quoted in* S. McConville, *A Review of the Correctional Policies of the District of Columbia* 258 (1986). Referring to his negotiations with the Government, the Mayor later recounted that he "threatened not to take any more prisoners ... [and] to take those prisoners over to the Justice Department and leave them right there for the Attorney General ..." *The Washington Post,* August 22, 1985, C7, cols. 2–3, *quoted in* S. McConville, *supra,* at 258. Most recently, the District has expressed ambivalence regarding the source of its historic obligation to house D.C. prisoners. Response to Plaintiff's Motion for Consolidation of Hearing on Preliminary Injunction with Trial of the Merits and Response to Plaintiff's Reply to Defendants Opposition at 8 n. 6.

within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons.

D.C.Code § 24–425 (1981).

The United States interprets the statute as conferring upon the Attorney General the discretionary, ministerial responsibility of designating appropriate facilities to which prisoners convicted in D.C. Superior Court shall be confined. According to the United States, the Attorney General has no obligation to maintain physical custody of the District's adult male prisoners, even though all female D.C.Code offenders are housed in federal facilities. On the contrary, the District interprets the Code provision as conferring upon the Attorney General both legal and physical custody of all sentenced prisoners. According to the District, the Attorney General does not merely provide an administrative function; rather, he is responsible for taking into federal prisons the District's sentenced prisoners when the District itself deems its own facilities unavailable, unsuitable, or inappropriate, and for retaining the prisoners for however long the District so determines.

Both plaintiff and defendants derive their divergent interpretations from what they deem is the "plain language" of the statute. Yet, "the notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification. A statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated." *Natural Resources Defense Council Inc. v. U.S. Environmental Protection Agency,* 725 F.2d 761, 768 (D.C.Cir.1984) (quoting *United States v. Monia,* 317 U.S. 424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting), *quoted with approval in, FBI v. Abramson,* 456 U.S. 615, 625 n. 7, 102 S.Ct. 2054, 2061 n. 7, 72 L.Ed.2d 376 (1982)). Perhaps the only disputed interpretation that can be resolved by a mere reading of the "plain language" of the statute is the District's claim that § 24–425 requires the Attorney General to house sentenced prisoners in federal, *rather than* District prisons. Clearly, by its precise terms, the statute authorizes the Attorney General to designate institutions maintained by the District of Columbia as potential places of confinement for sentenced prisons. It is beyond all reasonable reaches of logic for the District to assert that Congress intended to *require* the Attorney General to house the District's sentenced prisoners *only* in federal prisons. To resolve more meritorious conflicts of interpretation, however, the meaning of a statute cannot be gained by confining inquiry within its four corners, especially when the statute, like the one before the Court, is part of a legislative process having a history and a purpose. The Court thus turns to the history of the section in question.

### I. Legislative History

### A. Congressional Intent to House D.C. Prisoners in D.C. Facilities

A review of the legislative history of D.C.Code § 24–425 reveals that Congress intended D.C. prisoners to be housed in D.C. prisons and to be the responsibility of the District of Columbia government. In its pleadings the United States reviews at length the history of the appropriation of funds by Congress since 1866 to permit the construction of prisons in the District or Northern Virginia to house the District's prisoners. That history shows, as unequivocally as history ever can, that Congress built those prisons and jails to house the District's convicted prisoners, and that it intended the District's prisoners to be housed in them and not in federal prisons. The Attorney General's designation of sentenced D.C. prisoners to the D.C. Department of Corrections is thus clearly consistent with Congressional intent.

The Act of July 25, 1866, 14 Stat. 231, authorized the Secretary of Interior to cause a jail to be constructed in the District of Columbia and, when built, to occupy the

site of the present jail. In 1873, Congress re-enacted, in the form of a code, those statutes which pertained to the government of the District of Columbia in a book entitled *Revised Statutes of the United States Relating to the District of Columbia Passed at the First Session of the Forty–Third Congress.* Sections 1081 to 1099 of that codification dealt with administration of the recently constructed D.C. Jail and the treatment of the prisoners housed there. Sections 1087 and 1088 directed the warden of the D.C. Jail to accept into the D.C. Jail prisoners delivered by the Marshal who were awaiting court appearances. Another section of those revised statutes contemplated the construction of a penitentiary in the District to which all D.C. felons, serving their sentences in other places, could be transferred. Finally, in specifying the punishments for crimes defined in other sections of these Revised Statutes, Congress indicated that punishment for the particular crime involved was either "imprisonment and labor in the penitentiary" for a felony or "imprisonment in the District Jail." Sections 1144–1166, 1173–1181. Thus, as early as 1873, Congress specifically directed that D.C. prisoners detained awaiting trial or convicted of a felony or a misdemeanor be housed in those D.C. institutions that Congress created for that purpose.

In 1909, Congress authorized the purchase of a site and the construction of temporary buildings for a reformatory and workhouse at what would become the sites of the workhouse at Occoquan and the reformatory at Lorton. Act of March 3, 1909, 35 Stat. 717. In 1916, with the workhouse and reformatory about to be built, Congress directed that penitentiary sentences imposed upon D.C. prisoners were to be served in the new reformatory at Lorton. Act of September 1, 1916, 39 Stat 711. The Act also authorized the transfer of D.C. prisoners who were serving sentences in other penitentiaries to the new reformatory. Similarly, in 1911, Congress had transferred to the Commissioners of the District of Columbia whatever residual responsibilities the Attorney General and the (then) Supreme Court of the District of

Columbia had. Act of March 2, 1911, 36 Stat. 1003. That Act specifically required those Commissioners to accept into the D.C. Jail all persons committed to the Jail by the Attorney General.

As these acts of Congress establish, Congress created the D.C. Jail, the workhouse at Occoquan, and the reformatory at Lorton for the express purpose of housing those persons convicted of crimes in the District and those persons detained prior to trial in the courts of D.C. At no point in the history of the District of Columbia did Congress ever hint that it intended prisoners, convicted in or detained for trial by the District of Columbia courts, to be housed in federal prisons *rather than* in the very institutions created by Congress in the District of Columbia, at Lorton, and Occoquan for their incarceration. To the contrary, Congress specifically directed these prisoners to be incarcerated in the D.C. Jail, Occoquan or Lorton and ordered D.C. officials to take them into their custody.

The Court cannot help but question either the District's sincerity or its strategy in waiting until this time before asking the Court to declare that the District of Columbia prisoners are the charges of the federal government. During the past seventeen years of the prison crisis, the Attorney General has routinely designated District prisoners to the D.C. Department of Corrections without any court challenge from the District Government.

Indeed, the District has often asserted just the opposite and admitted sole responsibility for the housing and maintenance of its prisoners. On July 11, 1986, for example, after a riot by prisoners at Occoquan destroyed part of that facility, the Mayor of D.C., as a condition of the U.S. Bureau of Prison's accepting 300 more of the District's prisoners into federal prisons, stated in a letter to the Attorney General that "the District of Columbia agrees to insure that space is available in the future to house *all* D.C.Code violators who are transported to the D.C. Jail from the Superior Court." Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary Restraining Order

and for Preliminary Injunction, exhibit D (emphasis added). Similarly, on March 4, 1988, Mr. Williams, the Director of the D.C. Department of Corrections, indicated in a letter to Mr. John D. Bates, Chief of the Civil Division of office of the United States Attorney for the District of Columbia, that *all* prisoners delivered to the D.C. Jail would be immediately accepted into the Jail even if their acceptance caused the population briefly to exceed the 1,694 inmate ceiling imposed on the Jail by Judge Bryant. *Id.*, exhibit F.

After nearly two decades of litigation over the prison crisis, the District now urges the Court to believe that all along it "knew" that under the "true meaning" of § 24–425 sentenced D.C. prisoners were the Attorney General's responsibility but that it continued to accept them without filing suit raising this objection, notwithstanding the numerous court orders and contempt citations concerning overcrowding. It seems reasonable to the Court that had the District truly believed that the Attorney General had such "colonial" responsibility,[5] the District would have attempted to enforce it long ago, thereby avoiding the very crisis that it now faces.

### B. The Attorney General's Lack of Physical Custody Over D.C. Prisoners

Notwithstanding the legislative history indicating a clear Congressional intent to promote the incarceration of D.C. prisoners in D.C. facilities, defendants argue that § 24–425 gives the Attorney General "custody" over prisoners which in turn enables the Attorney General to control assignments and transfers throughout a prisoner's period of incarceration. Moreover, the District argues, § 24–425 increases the number of institutions to which locally-convicted prisoners can be assigned—from § 24–402's "penitentiary, jail, or the Reformatory of the District of Columbia," to

all prisons, provided they are "available, suitable, and appropriate." The United States does not quarrel with the District's recognition of the Attorney General's power to transfer inmates among prisons nor his authority to designate both federal and D.C. facilities as suitable places of confinement for D.C. prisoners. The District, however, goes beyond this analysis and deems the Attorney General's "custody" not legal custody to assign prisoners, but physical custody to maintain prisoners whom the District, through its unilateral action, turns away from its facilities due to alleged overcrowding.

Again, legislative history sheds light on the meaning of "custody." As plaintiff asserts, and as defendants readily concur in their pleadings, § 24–425 was primarily designed to ensure that the Attorney General retained assignment and transfer power over prisoners initially assigned to District institutions under D.C.Code § 24–402, so that when parole violations occurred outside the District while the violator was on parole from the District system, the violator may be transferred to an institution other than one belonging to the District of Columbia.

The precursor of D.C.Code § 24–425 was part of legislation enacted in 1940, at the suggestion of the D.C. Parole Board and the Department of Justice, to improve the D.C. Parole system by eliminating a series of technical problems that had arisen since the creation of the D.C. Parole Board in 1932. H.R.Rep. No. 1994, 76th Cong., 3rd Sess. (1940). One problem was the possibility that a parolee would violate his parole while far from the District and that the Parole Board might have to transport the parolee from the place of apprehension back to the District of Columbia, even though there was a nearby federal prison where the parolee could serve out the rest of his sentence. To make it clear that the Attorney General could cause the D.C. pa-

---

5. In its pleadings, the District refers to Congress's "colonial treatment" of the District. Defendants' Reply to Plaintiff's Supplemental Memorandum at 9 ("It is not surprising, in light of the colonial treatment Congress has accorded the District's criminal justice system, that it chose to direct that all persons sentenced in the Courts of the District are to be committed to the custody of the Attorney General of the United States, rather than to a District of Columbia official.").

rolee to serve his sentence at that nearby federal prison, Congress authorized the Attorney General to designate "any ... institution[s], whether maintained by the District of Columbia Government ... or whether within or without the District of Columbia" as the place of confinement for that parolee. Act of June 6, 1940, 54 Stat. 242, 244.

■ The Court rejects the District's proffered statutory interpretation that seeks to transform the Attorney General's power to transfer parole violators who are *outside* the District into a type of unqualified physical custodianship for adult male D.C. prisoners tried in D.C., sentenced in D.C., and *presently located* in D.C.[6] Such a strained reading of the statute not only contradicts Congress's intent; if adopted, it would also foster the District's avoidance of responsibility, increase costs to the federal government, deprive prisoners of family visitation, and hinder prisoners' rehabilitation efforts within their home communities.

## II. Judicial Review of the Attorney General's Designation of Places of Incarceration

Having established that the Attorney General has the authority to designate both federal and District facilities for housing D.C. prisoners, the Court is left with three questions: (1) who is to decide which facilities are "available, suitable, and appropriate" within the meaning of the statute; (2) to what extent is that decision subject to judicial review; and (3) has the Attorney General exceeded his authority in this case in designating the D.C. Department of Corrections as the facility of confinement for adult male D.C.Code violators.

### A. The Attorney General's Power to Determine the Availability, Suitability, and Appropriateness of D.C. Correctional Facilities

The District maintains that it has the authority unilaterally to determine whether or not the D.C. Department of Corrections, and each of its individual facilities, is available, suitable, and appropriate within the meaning of D.C.Code § 24–425. Indeed, the District has done so using its own officials' failures to manage D.C. prisons as justifications for such determinations. The District's interpretation, however, represents a distorted reading of a statute which clearly gives to *"the Attorney General of the United States or his authorized representative"* the authority to "designate any available, suitable, appropriate institutions" for confinement. D.C. Code § 24–425 (emphasis added).

■ Pursuant to D.C.Code § 24–468, the Attorney General may designate the Mayor as his authorized representative to perform the functions vested in him through § 24–425. D.C.Code § 24–468 (1981). Thus, the Attorney General has the option of empowering the District with the authority to designate places of confinement. From the day § 24–468 was enacted in 1966, however, the Attorney General has declined to take advantage of this provision. Instead, the Attorney General has retained the power to assess the availability, suitability, and appropriateness of the D.C. Department of Corrections, thereby thwarting any efforts on behalf of the District to declare all of its facilities closed to new inmates in the absence of Court determinations to that effect. Clearly, if the District were to have the power to determine unilaterally the availability, suitability, and appropriateness of the D.C. Depart-

---

6. Since 1966, the Attorney General has designated federal facilities for all *female* offenders sentenced to terms of imprisonment of over one year. Defendants suggest that such designation is evidence of the Government's responsibility to retain physical custody over D.C.Code violators generally. Response to Plaintiff's Motion for Consolidation of Hearing on Preliminary Injunction with Trial of the Merits and Response to Plaintiff's Reply to Defendants' Opposition at 15–17. The Court notes, however, that in 1966 the District completely ceased operation of its long term penal institution for women. The District's analogy to female prisoners' incarceration in federal facilities, due to the nonexistence of District facilities for women, is thus appropriate only to the extent that District facilities for adult male prisoners are similarly unavailable due to population limitations. The Government's responsibility for housing adult male prisoners thus remains a *qualified* obligation.

ment of Corrections, the District would be given free reign to establish the number and types of prisoners to be incarcerated in each of its facilities, without regard to the overcrowded conditions of the federal prison system. As decades of court orders belie, this is simply not the case.

### B. Judicial Review of the Attorney General's Designation of Facilities

The Attorney General's designation of D.C. prisoners to the D.C. Department of Corrections is subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (B) (1982).[7] The APA manifests a presumption in favor of judicial review of administrative action. *Consumer Federation of America v. F.T.C.*, 515 F.2d 367, 369 (D.C.Cir.1975) ("Under the APA, judicial review of administrative action is the rule ... unless there is statutory prohibition of judicial review or unless agency action is committed to agency discretion by law."); *Action on Safety and Health v. F.T.C.*, 498 F.2d 757, 760 (D.C.Cir.1974) ("[I]f a particular organic statute is silent on the question of judicial review, courts should recognize the basic presumption favoring judicial review embodied in the [APA]," so long as the action is not committed by law to agency discretion).

The constitutional issues inherent in this litigation further weigh in favor of judicial review. The District contends that the designation of prisoners to certain District facilities is subject to judicial review because such designation might violate the Eighth Amendment rights of inmates housed in those specific D.C. facilities. The Attorney General's designation of facilities is clearly subject to judicial review to the extent that the Attorney General's actions give rise to constitutional challenge. *Padula v. Webster*, 822 F.2d 97, 101 (D.C.Cir.1987) ("even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated"); *Webster v. Doe*, —— U.S. ——, 108 S.Ct. 2047, 2054, 100 L.Ed.2d 632 (1988) (even where Congress expressly commits an action to agency discretion, "a constitutional claim ... may be reviewed by the Court"). In the instant action, the Court does not have before it a specific constitutional challenge since the District does not contend that the Attorney General's designation of prisoners to the D.C. Department of Corrections *as a whole* violates prisoners' constitutional rights. Nevertheless, constitutional concerns are present in this case in that the population caps placed on specific facilities were effected in large part because prisoners' Eighth Amendment rights were endangered by the overcrowding in District correctional facilities. Such constitutional overtones thus bolster the need for judicial scrutiny of the Attorney General's designations.[8]

The Government nevertheless maintains that designation decisions under D.C.Code § 24–425 are committed to the broad, unfettered discretion of the Attorney General and therefore fall within the exception from judicial review provided for in the APA when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under this exception, a court

---

**7.** In relevant part, 5 U.S.C. § 706 states: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right...." 5 U.S.C. § 706(2)(A) and (B) (1980).

**8.** In considering the reviewability of the Attorney General's action, the Court takes note of recent decisions standing for the proposition that federal courts are generally ill equipped to second guess specific decisions of prison administrators. *See, e.g., Meachum v. Fano*, 427 U.S. 215, 225–229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64; *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1085–1086, 89 L.Ed.2d 251 (1986). This line of cases, however, deals with administrators' decisions regarding particular prison policy problems. In the case at hand, the Court is addressing the overall designation of facilities, a generalized decision more susceptible to judicial review.

may not review an agency's action under a statute if that statute is drawn in such broad terms that in a given case there is no law to apply and "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *Webster v. Doe,* —— U.S. ——, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

■ The Government's reliance upon this exception to judicial review is misplaced. D.C.Code § 24–425 clearly provides the Court with law to apply and establishes a specific, meaningful standard with which the Court may evaluate the Attorney General's designation decisions. The statute states that the Attorney General "may designate any *available, suitable, and appropriate* institution" and further authorizes the Attorney General "to order the transfer of any such person from one institution to another if, in his judgment, *it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined,* or for other reasons." D.C.Code § 24–425 (1981) (emphasis added). The language of the statute clearly establishes criteria to which the Attorney General must adhere in designating places of confinement for D.C. prisoners. Indeed, § 24–425 provides the Court with greater guidance for gauging agency discretion than do other regulatory standards that this circuit has recently deemed subject to judicial review. *See, e.g., Center for Auto Safety v. Dole,* 828 F.2d 799, 800–3 (D.C.Cir.1987) (finding "judicially manageable" a National Highway Transportation Safety Administration regulation providing that the "agency will grant a petition if the agency finds that there is a '*reasonable possibility*' of a safety-related defect in the manufacturers' cars") (emphasis added).

## C. The Attorney General's Designation Decisions Currently Under Review

■ It is the decision of this Court that under D.C.Code § 24–425, the District of Columbia must continue to accept and maintain prisoners duly designated by the Attorney General to the District of Columbia Department of Corrections, provided that such designation would not cause the D.C. facilities to exceed population limits set by the United States District Court. When, however, the specific facilities designated meet or exceed court-ordered population ceilings and no other regular or emergency facilities exist within the D.C. correctional system to house the assigned adult male prisoners, the Attorney General's designation of the D.C. Department of Corrections as an "available, suitable, and appropriate" institution of confinement is an arbitrary and capricious abuse of discretion.[9] In such circumstances, the Attorney General must retain custody of said prisoners. The Court simply cannot countenance the Attorney General's assigning prisoners to facilities beyond the point deemed constitutionally permissible by the United States District Court's orders setting population caps.

The Court finds that the Attorney General would not abuse his discretion in designating prisoners to the D.C. correctional system at this time, up to limits imposed by the population caps, because the District of Columbia Department of Corrections currently includes facilities available, suitable, and appropriate for the incarceration of newly sentenced adult male D.C.Code violators. The population of various D.C. facilities has decreased substantially since October 2, 1988, the day before the District's announcement that it could no longer accept newly sentenced prisoners from the Superior Court. According to the District's latest filing, as of October 26, 1988, there were 282 fewer prisoners at the D.C. Jail than there were on October 3, 1988,

9. In *Twelve John Does,* Judge June Green reached a similar conclusion regarding the Attorney General's abuse of discretion in designating prisoners to Lorton's overcrowded facilities. *Twelve John Does v. District of Columbia,* 668 F.Supp. 20, 22 (D.D.C.1987), *rev'd,* 841 F.2d 1133 (D.C.Cir.1988) (reversed on procedural grounds); *see also Board of Sup'rs of Fairfax County, VA. v. United States,* 408 F.Supp. 556, 561 *appeal dismissed,* 551 F.2d 305 (4th Cir. 1977).

and the Jail is now within the population limit imposed by Judge Bryant. Additionally, there are 136 fewer prisoners in the Central facility at Lorton. On the whole, there are 484 fewer prisoners in the District's correctional system than there were on October 3, 1988. The D.C. facilities are now operating at 14% over rated capacity, while the federal Bureau of Prisons is currently operating at 57% over rated capacity. Thus, compared to the federal system, in terms of population, the D.C. Department of Corrections is available, suitable and appropriate. The District, however, has not begun to re-accept newly sentenced prisoners.

In addition to housing prisoners in facilities that are within their population limits [10], the District currently has before it a variety of options for housing sentenced prisoners whom the guards have turned away. At the October 7, 1988 hearing on plaintiff's motion for a temporary restraining order, the United States reviewed in detail the District's many available alternatives for accepting newly-sentenced prisoners into the District system, while keeping in compliance with the current population caps. Among the Government's suggestions were the following: (1) building modular or permanent construction at sites other than Lorton; (2) increasing capacity at other facilities such as Occoquan; (3) transferring prisoners to other states; (4) increasing the use of the Emergency Powers Act, authorizing the Mayor to release certain inmates before the ordinary expiration of their sentences to relieve overcrowding; (5) transferring prisoners to private facilities; (6) adopting electronic monitoring as an alternative to incarceration; (7) transferring prisoners to Saint Elizabeths Hospital; (8) housing prisoners in one of two community centers; (9) posting bond for prisoners eligible for pretrial release; (10) reconstructing specific facilities at Lorton. The District in turn indicated that it was trying to adopt some of these suggestions.

■ Given this range of options, it is somewhat disingenuous for the District to hide behind the guise of court-ordered population ceilings at various facilities, lock the doors of those facilities, and then abdicate responsibility for housing newly sentenced District prisoners in the D.C. system as a whole. It is therefore the decision of this Court that the District of Columbia must immediately undertake all feasible measures to provide space for all adult male prisoners sentenced hereafter by the Superior Court.

## CONCLUSION

The District's intransigent refusal promptly to expand its prison capacity has tested and found the limits of judicial patience as evidenced by the many court orders. The Court does not condone the District's most recent tactic of perpetuating an overcrowding crisis by not building new facilities, waiting until the situation becomes so severe that various facilities come under court-ordered population caps, and then offering the court orders as an excuse for the District's further evasion of responsibility in managing its own penal institutions. Nevertheless, the Court has no choice but to enforce the provisions of D.C. Code § 24–425 as it currently exists. To the extent that the statute places an intolerable burden upon the federal prison system and enables the District to evade its responsibilities to its constituents, to its prisoners, and to the Courts, it is the province of Congress, not this Court, to eliminate those defects through statutory amendment. Specifically, Congress could

10. Under the District's current procedure, the D.C. Jail serves as the intake institution for the entire Department of Corrections. "It is at the Jail that initial comprehensive physical examinations are normally conducted by a medical services contractor and initial classification determinations are made." Response to Plaintiff's Motion for Consolidation of Hearing on Preliminary Injunction with Trial of the Merits and Response to Plaintiff's Reply to Defendant's Op-

position at 4 n. 3. Pursuant to this opinion, the District must continue to accept new prisoners for intake processing, notwithstanding the cap on the Jail, if other facilities exist within the D.C. Department of Corrections that either can serve as temporary intake institutions or can house prisoners transferred out of the Jail so as to make room for newly sentenced prisoners within the Jail.

either provide that all D.C. prisoners shall be directly sentenced to the custody of the D.C. Department of Corrections or provide that the Attorney General shall retain custody of said prisoners and shall manage, staff, and operate the D.C. correctional facilities. Despite the troubled history of the District's prison system, however, Congress has done neither.

Therefore, the Court grants plaintiff's request for declaratory judgment and injunctive relief in part and orders the District of Columbia to continue accepting and providing for prisoners duly designated by the Attorney General to appropriate, suitable, and available facilities within the District of Columbia Department of Corrections as defined by this decision. The Court will closely monitor the District's compliance with this Court's order that the District immediately undertake all feasible measures to provide space for all adult male prisoners sentenced hereafter by the Superior Court.

An order consistent with the foregoing accompanies this Memorandum Opinion.

### ORDER

Upon consideration of the United States' petition for declaratory relief and permanent injunction and the entire record herein, and in accordance with the accompanying Memorandum Opinion, it is this 10th day of November, 1988, hereby

ORDERED that the United States' petition for declaratory and injunctive relief is hereby GRANTED in part; and it is

FURTHER ORDERED that the District of Columbia is hereby enjoined from refusing to accept into the District of Columbia Department of Corrections facilities all newly sentenced adult male prisoners whom the Attorney General duly designates to the District of Columbia Department of Corrections pursuant to his authority under D.C.Code § 24–425, provided that such designation would not cause the specifically designated facilities to exceed their population capacities as set by court order; and it is

FURTHER ORDERED that the District of Columbia must immediately undertake all feasible measures to provide space for all adult male prisoners sentenced hereafter by the Superior Court; and it is

FURTHER ORDERED that the Court shall retain continuing jurisdiction over this matter; and it is

FURTHER ORDERED that this order shall be stayed until November 14, 1988.