UNITED STATES of America

v.

DISTRICT OF COLUMBIA, et al., Appellants.

UNITED STATES of America, Appellant,

v.

DISTRICT OF COLUMBIA, et al.

Nos. 89–5031, 89–5056.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1990.

Decided March 2, 1990.

Charles L. Reischel, Deputy Corp. Counsel, with whom Herbert O. Reid, Sr., Acting Corp. Counsel, and Edward E. Schwab, Asst. Corp. Counsel, were on the brief, for appellants in 89–5031 and cross-appellees in 89–5056.

John D. Bates, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., R. Craig Lawrence, John M. Facciola, and John C. Cleary, Asst. U.S. Attys., were on the brief, for appellee in 89–5031 and cross-appellant in 89–5056.

Before: WALD, Chief Judge, RUTH BADER GINSBURG and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case highlights the unique division of authority and responsibility in the District of Columbia (D.C. or District) between the local and federal governments; the context is prisons. Under section 24–425 of the D.C.Code, prisoners convicted in the District are committed "to the custody of the Attorney General of the United States"; the Attorney General is authorized to assign prisoners to "any available,

suitable, and appropriate institutions."[1] After the District of Columbia government closed the doors of its overcrowded prisons, the United States sued to enjoin the District from refusing to accept prisoners designated by the Attorney General to the D.C. Department of Corrections. The district court held, in essence, that the District was entitled to close its prison doors only if accepting additional prisoners would violate the Constitution or judicial orders setting prison population limits; furthermore, closure would be lawful only when authorized by a court after a hearing. Both sides have appealed the district court's decision. We affirm in principal part, with certain modifications stated below.

### I. CONTOURS OF THE CONTROVERSY

This case was brought in the aftermath of a series of suits by inmates of various District of Columbia correctional facilities alleging constitutional violations stemming from prison overcrowding. As a result of these suits, several D.C. correctional facilities are currently subject to court-ordered or court-approved population ceilings.[2] On October 4, 1988, the District announced that it would no longer accept into the D.C. Department of Corrections adult male prisoners sentenced in D.C. Superior Court,[3] because the District's prisons were either at or over capacity; "[u]ntil the inmate population is decreased," the D.C. Corrections Department director stated in an affidavit prepared shortly after the shutdown,

"the facilities of the Department ... are not suitable, appropriate or available for the placement of newly sentenced inmates." Affidavit of Hallem H. Williams, Jr., Joint Appendix at 69.

On October 5, 1988, the United States filed a complaint in the district court for declaratory and injunctive relief against the District and named D.C. officials. *See* Joint Appendix at 11–15. The United States alleged that the District had breached its obligation under D.C.Code § 24–425 to: "(1) receive into its Department of Corrections prisoners committed to it; and (2) house sentenced Prisoners either pending the designation of their place of confinement by the Attorney General *or after the Attorney General has designated the District of Columbia Department of Corrections as their place of confinement." *Id.* at 14.

The District contended in response that D.C.Code § 24–425 provides no statutory basis for imputing to the District the primary responsibility for housing prisoners sentenced in Superior Court. Instead, the District asserted, such responsibility falls on the Attorney General, who must maintain federal custody of D.C.-sentenced prisoners whenever the District determines that its own facilities are unavailable, unsuitable, or inappropriate.

The district court, after canvassing the legislative history of section 24–425 and related statutes, held that "Congress in-

---

**1.** That statute provides, in pertinent part:

All prisoners convicted in the District of Columbia for any offense ... shall be committed ... to the custody of the Attorney General of the United States ..., who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons.

D.C.CODE ANN. § 24–425 (1981).

**2.** Three D.C. correctional facilities are now under such caps—the D.C. Jail, *see Campbell v. McGruder,* C.A. No. 71–1462 (D.D.C.), the Maximum Security Facility at Lorton, *see Doe v. District of Columbia,* C.A. No. 79–1726 (D.D.C.), and Lorton's Central Facility, *see Twelve John Does v. District of Columbia,* C.A. No. 80–2136 (D.D.C.). These three facilities contain about half the rated capacity of the D.C. Department of Corrections. *See* Declaration of Walter B. Ridley, Joint Appendix at 73.

**3.** Because the District has no long-term penal institution for women, female offenders sentenced in D.C. Superior Court are housed in federal facilities. *See United States v. District of Columbia,* 703 F.Supp. 982, 991 n. 6 (D.D.C. 1988).

tended D.C. prisoners to be housed in D.C. prisons and to be the responsibility of the District of Columbia government." *United States v. District of Columbia*, 703 F.Supp. 982, 988 (D.D.C.1988). However, the Attorney General's designations to the District were limited, the district court held, by the statutory requirement that facilities be "available, suitable, and appropriate." *See id.* at 992–93. That determination was for the Attorney General, not the District, to make, the court continued, but it was a decision subject to judicial review, the district court believed, under the Administrative Procedure Act (APA). *See id.* The court also grounded its authority to review Attorney General action on an alternate basis—the constitutional underpinnings of the overcrowding claims and the prospect that designation of additional prisoners might trigger violations of court-ordered, constitutionally-based population caps. *See id.* at 992, 993.

In a subsequent order issued in response to the District's motion to alter or amend the judgment, and the United States' motion to implement it, the court described the regime its initial decision anticipated. The court interpreted the "available, suitable, and appropriate" limitation to preclude the Attorney General from assigning prisoners to the D.C. correctional system whenever "such designation would ... cause the District, through its subsequent designation of specific facilities, to violate existing court decrees or the Constitutional rights of affected prisoners." *See* Implementation Order of December 16, 1988, ¶ 2, C.A. No. 88–2897 (modifying original order) (hereafter Implementation Order). The court's order set up a procedure for the District to challenge future designation decisions of the Attorney General. *See id.*, ¶ 5. Under that procedure, if the District could show that the challenged designations would force it to violate the Constitution or a court decree setting or enforcing population limits, it would be entitled to refuse admission of the prisoners.

Fearing that its decision would enable the District to "hide behind the guise of court-ordered population ceilings at various facilities, lock the doors of those facilities, and then abdicate responsibility for housing newly sentenced District prisoners in the D.C. system as a whole," 703 F.Supp. at 994, the court ordered that before shutting prison doors, the District demonstrate that it had "undertaken all feasible measures to provide space for all adult male prisoners sentenced by the Superior Court." Implementation Order, ¶ 5(c)(5). The court also required the District to file a monthly report detailing in seventeen separate respects the efforts it was making to expand its prison capacity. *See id.*, ¶ 4.

## II. DISCUSSION

### A. Statutory Basis for District's Obligation to House Prisoners

Proceedings in the district court have substantially narrowed the scope of this controversy. Initially, each side disclaimed judicially-enforceable responsibility for housing adult male prisoners convicted in D.C. Superior Court. The District contended that the Attorney General bore the onus of "taking into federal prisons the District's sentenced prisoners when the District itself deems its own facilities unavailable, unsuitable, or inappropriate, and for retaining the prisoners for however long the District so determines." *United States v. District of Columbia*, 703 F.Supp. at 988. On its part, the United States insisted that "responsibility lies with the District to house the prisoners in District facilities, whether or not they exceed court-ordered population caps...." *Id.* at 987.

On appeal, the United States does not dispute that the Attorney General's designation decisions are limited by the Constitution and court-ordered population caps. *See* Brief for the United States at 15 n. 7, *citing* 703 F.Supp. at 992. And the District currently "welcome[s] the opportunity to have the courts decide ... the extent to which the District is required to accept prisoners designated by the Attorney General." Reply Brief for the District of Columbia at 4.

The district court has decided that issue, finding that section 24–425 of the D.C. Code, in light of its history and when read

in its statutory context, does assign to the District the primary responsibility for housing locally-convicted prisoners. We agree that section 24–425, viewed in conjunction with related statutory provisions prescribing the District's penological responsibilities, imposes such an obligation on the District.

On its face, section 24–425 imposes on the Attorney General no preference for the use of D.C. prisons over federal or even state facilities.[4] Section 24–425 originated in legislation designed to improve the D.C. parole system. *See* Act of June 6, 1940, 54 Stat. 244, ch. 254, § 8; H.R. REP. No. 1994, 76th Cong., 3d Sess. (1940) (hereafter House Report). By conferring on the Attorney General continuing authority over the assignment and transfer of D.C.-sentenced prisoners, and specifically including federal and "other" institutions in the list of eligible destinations, Congress enabled the federal government to assign parole violators apprehended in distant locations to prisons situated near the place of their apprehension for the duration of their sentences. *See* House Report at 3.

Did Congress also intend the provision now contained in section 24–425 to cover the District's obligation to house its prisoners? For enlightenment, one must look to the preexisting statutory scheme. Congress has historically chosen to house D.C.-sentenced violators in D.C. facilities, as long as such facilities were available. Because there was no D.C.-operated penitentiary until well into this century, the responsibility initially devolved upon the federal government to find housing for D.C. prisoners convicted of felonies. In 1909, Congress authorized the purchase of land for construction of a workhouse at Occoquan and a reformatory at Lorton. *See* Act of March 3, 1909, 35 Stat. 688, 717, ch. 250. Anticipating the completion of those facilities, Congress in 1916 enacted the provision that now appears at section 24–402

of the D.C.Code, requiring prisoners convicted in D.C. courts "and sentenced to imprisonment for more than one year" to be "imprison[ed] in such penitentiary, jail, or the reformatory of the District of Columbia as the Attorney General may from time to time designate." Act of Sept. 1, 1916, 39 Stat. 711, ch. 433 (codified at D.C. CODE ANN. § 24–402 (1981)). *See also* D.C. CODE ANN. § 24–410 (1981) (codifying 1911 statute that required the D.C. government to "receive and keep in the Washington Asylum and Jail all prisoners committed thereto for offenses against the United States").

■ In light of this statutory complex and history, the district court correctly concluded that "Congress created the D.C. Jail, the workhouse at Occoquan, and the reformatory at Lorton for the express purpose of housing those persons convicted of crimes in the District and those persons detained prior to trial in the courts of D.C.," and that D.C.Code § 24–425 was intended to effectuate and implement that congressional purpose. 703 F.Supp. at 989.

We therefore affirm the central provision of the district court's decision and superseding Implementation Order. That directive enjoins the District from refusing to accept into the D.C. Department of Corrections facilities newly sentenced adult male prisoners whom the Attorney General assigns to the Department, provided that the designation would not cause the District to violate court-ordered population caps or the constitutional rights of prisoners. The regime established by the district court, we find, under which the District may seek judicial authorization to close its doors, may appropriately be employed to "sound the alarm" if constitutional rights are in jeopardy.

B. *Constitutional Limits on District's Obligation*

■ The District does not frontally attack on appeal its obligation to accommo-

---

**4.** Certainly, section 24–425 would not entitle the Attorney General to force a state penal system to accept prisoners designated thereunder. However, because the District of Columbia possesses a "unique status" that is "truly *sui generis* in our governmental structure," the extent to

which its rights and responsibilities, as defined under a particular statute, resemble those of a state must be determined by ascertaining congressional intent on a case-by-case basis. *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973).

date prisoners up to the limits imposed by the Constitution; but the District does contend that the district court erred in requiring the District, before refusing prisoners, to demonstrate imminent constitutional violations, rather than merely pointing to overcrowded conditions posing a more distant threat of such violations. Under the district court's formulation, the District argues, the D.C. government would be required to acknowledge the commission of constitutional violations before being able to refuse prisoners, thereby subjecting itself to liability under 42 U.S.C. § 1983. *See Morgan v. District of Columbia*, 824 F.2d 1049, 1064 (D.C.Cir.1987) (court finding that District government had failed to conform to judicially-mandated population ceilings at D.C. Jail held admissible as evidence in section 1983 suit by inmate).

Under the terms of the district court's injunction, however, the District would have to show only that admitting the additional prisoner or prisoners designated by the Attorney General would precipitate a violation of the Constitution; the District would then be authorized to deny admission, thus averting an eighth amendment affront. Rather than triggering section 1983 liability, then, this procedure would be probative of the city's efforts to *avoid* such liability. The district court appropriately imposed on the city's ability to avoid accepting prisoners the same exacting definition of eighth amendment violations as is applied in suits by inmates themselves alleging that conditions of confinement constitute cruel and unusual punishment. *See Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 837 (D.C.Cir.1988) ("It is cruel conditions, defined by reference to community norms, to which the Constitution speaks; neither 'deficient' conditions nor conditions that violate 'professional standards' rise to the lofty heights of constitutional significance.").

## C. *Scope of Appropriate Remedy*

The District next maintains that the United States has shown no cause for requiring the District to demonstrate that it has "undertaken all feasible measures to provide space for all adult male prisoners sentenced by the Superior Court" before receiving judicial authorization to refuse admission of additional inmates. Implementation Order, ¶ 5(c)(5). In shaping equitable remedies, courts should be mindful that the range and flexibility characteristic of equity are not uncontrolled. In particular, the scope of the remedy is determined by the nature and extent of the violation the decree seeks to cure. *See Inmates of Occoquan*, 844 F.2d at 841. Principles of equitable restraint apply with special force when federalism, as well as separation of powers, concerns are implicated. *See Spallone v. United States*, — U.S. —, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990); *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) ("[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.").

When a district court's order is necessary to remedy past constitutional violations caused or countenanced by state and local prison administrators, the court sometimes may be justified in exercising its equitable powers extensively. *See Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). However, in this case, the district court made no finding that any eighth amendment violation, as defined by the exacting standard set in *Rhodes v. Chapman, supra*, had occurred. Indeed, no such violations were even alleged in this case: the Attorney General initially sued to insist that prisoners be accommodated without regard to constitutional constraints. Furthermore, the regime established by the district court aims simultaneously to preclude the District from violating prisoners' constitutional rights and the Attorney General from forcing such violations via his designation decisions. Therefore, the Attorney General has demonstrated no cause to override the traditional presumption that "the operation of our correctional facilities is peculiarly the province of the Legislative and Execu-

tive Branches of our Government, not the Judicial." *Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979); *see also Inmates of Occoquan,* 844 F.2d at 844 (noting that "[i]n th[e] setting of institutional conditions litigation, courts must ... craft remedies with extraordinary sensitivity").

The "all feasible measures" requirement, therefore, although it might be necessary or proper in a suit to rectify proven constitutional violations, goes beyond the nature and extent of the violation of law at issue in this case, namely, the District's refusal to accept prisoners the Attorney General designates to it. *Cf. Inmates of Occoquan,* 844 F.2d at 843 n. 22 (finding that district court overstepped the limits on its equitable powers in imposing a population cap absent proof of constitutional violations and because any such violations "could have been corrected by other means"). Accordingly, we direct that ¶ 5(c)(5), the provision imposing the "all feasible measures" requirement, be deleted from the Implementation Order. The district court's further mandate that the District report each month on its progress towards expanding prison space was derived from proposals of the United States designed to implement the "all feasible measures" decree. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Alter or Amend and in Support of Plaintiff's Motion to Implement, C.A. No. 88–2897 (Nov. 22, 1988), at 4, 17. Because we set aside that aspect of the order, we direct that the monthly reporting requirement, now found in ¶ 4 of the Implementation Order, be eliminated as well.

D. *Availability of APA Review*

Finally, we find it unnecessary to address the contention of the United States that the district court erred in finding the Attorney General's designation decisions reviewable under the APA. The district court properly grounded its injunction on the Constitution and the potential violation of court orders limiting prison population levels. *See* 703 F.Supp. at 992, 993. The United States has explicitly disavowed any "challenge [to those] ... alternative grounds for reviewability." *See* Brief for the United States at 15 n. 7. Constitutional standards provide the most definitive and securely ascertainable measure of whether a facility is "available, suitable, and appropriate" within the meaning of D.C.Code § 24–425. APA review, it appears to us, even if it were available, would only mirror review under the Constitution.

Because the district court could have rested its holding solely on the constitutional basis it identified and with which the United States does not quarrel, resort to the APA as a basis for judicial review, and as a component of the court's resultant remedy, was unnecessary. *Cf. Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) (holding that an administrator's decision unreviewable under the APA may be subject to review when a substantial constitutional question is implicated). We therefore modify ¶ 5 of the Implementation Order by deleting from it ¶ 5(c)(4)—the prescription for APA review—and the phrase "under the Administrative Procedure Act." These excisions leave in place the review procedure established by the Implementation Order for checking, on the District's petition, Attorney General designations to the D.C. Department of Corrections for conformity with constitutional limitations.

CONCLUSION

For the foregoing reasons, we affirm in principal part, subject to the enumerated modifications, a decree that effectively prevents the District of Columbia from unilaterally closing its prison system absent a court order preceded by a hearing.

*It is so ordered.*