**Marline JACKSON, et al., Appellants,**

v.

**Richard K. THORNBURGH, Attorney General of the United States, et al., Appellees.**

**No. 89–5017.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1989.

Decided July 6, 1990.

David W. DeBruin, Washington, D.C., for appellants.

John D. Bates, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., R. Craig Lawrence and Daniel Bensing, Asst. U.S. Attys., were on the brief, for Federal appellees. Bradley L. Kelly, Asst. U.S. Atty., Washington, D.C., also entered an appearance, for appellees.

Herbert O. Reid, Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., and Martin B. White, Asst. Corp. Counsel, Chevy Chase, Md., were on the brief for appellees District of Columbia, et al.

Before EDWARDS, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

STEPHEN F. WILLIAMS, Circuit Judge:

In order to reduce overcrowding in District of Columbia penal facilities, the District's Good Time Credits Act of 1986 grants early release to prisoners serving sentences in them. A group of female District offenders, housed in a federal facility and hence not covered by the law, challenges its constitutionality on equal protection grounds. They attack the disadvantage both as unlawful gender discrimination and as irrational. Finding heightened scrutiny not to apply, we deny the discrimination claim because the Act's distinction is not based on gender, either overtly or covertly. We also reject the claim that *their* exclusion fails to meet the basic "rationality" requirement of equal protection. We do not address the equal protection arguments that may be available to male prisoners, none of whom is before us, finding the female inmates without standing to assert claims special to their male counterparts.

## I

The sorry tale of the District's prison overcrowding crisis has been amply described elsewhere by this court. See *Twelve John Does v. District of Columbia,* 855 F.2d 874 (D.C.Cir.1988); *Morgan v. District of Columbia,* 824 F.2d 1049, 1050 (D.C.Cir.1987); *Inmates of Occoquan v. Barry,* 844 F.2d 828, 829–35 (D.C.Cir.1988); *Campbell v. McGruder,* 580 F.2d 521, 533–40 (D.C.Cir.1978); *United States v. District of Columbia,* 703 F.Supp. 982, 985–87 (D.D.C.1988), *aff'd, United States v. District of Columbia,* 897 F.2d 1152 (D.C.Cir. 1990). As one answer to the problem, the District's city council in 1986 enacted the Good Time Credits Act, codified at D.C. Code §§ 24–428 through 24–434 (1989), under which persons convicted of D.C.Code offenses and who are "imprisoned in a District correctional facility" are automatically eligible for reduced minimum sentences (for so long as they remain on good behavior), and thus for earlier parole eligibility. Inmates covered by the Act can see their prison time reduced by as much as a third.

But not all District offenders serve their sentences in District jails. Under D.C.Code § 24–425, the Attorney General of the United States designates the place of confinement, "whether maintained by the District of Columbia government, the federal government, or otherwise," for all persons convicted of crimes in the District. Under this provision District offenders of both sexes have been assigned to federal facilities and are currently serving sentences there. As for male District offenders, the federal authorities have not made clear exactly what circumstances will cause assignment to federal facilities, but they appear to resist accepting any more prisoners than necessary to keep District facilities within court-ordered and/or constitutionally mandated population limits. See *United States v. District of Columbia,* 897 F.2d at 1154–

55. For female convicts, by contrast, the relationship between the two systems is well defined: the District maintains *no* facility for female prisoners serving sentences of more than a year; all are automatically sent to the Federal Correctional Institution at Alderson, West Virginia. See *id.* at 1154 n. 3.

Appellants are inmates at Alderson, and therefore ineligible for credits under the 1986 Act because they are not "imprisoned in a District correctional facility." Instead, a federal act controls the effect of good behavior, providing for the reduction of maximum sentences only, with no effect on the date of eligibility for parole. Good Time Credits Act, 18 U.S.C. § 4161 (1988).[1] The women attack the denial of benefits under the District's Act as a violation of their right to equal protection under the Fourteenth Amendment as incorporated into the due process clause of the Fifth Amendment. See *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). On summary judgment the district court upheld the law, see *Jackson v. Thornburgh,* 702 F.Supp. 9 (D.D.C.1988), and this appeal followed.

## II

■ Where a statute draws a "facial" distinction between the treatment of men and women, courts demand "an exceedingly persuasive justification," and place on the government the burden of showing that the distinction is "substantially related" to "important governmental objectives." *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (internal quotations omitted). In *Pitts v. Thornburgh,* 866 F.2d 1450, 1453 (D.C.Cir.1989), we found this test appropriate in assessing the District's gender-explicit policy of assigning females

1. Section 4161 was repealed effective November 1, 1987, but remains applicable for the five years to 1992 for prisoners convicted for offenses occurring before November 1, 1987. Framed as covering prisoners "convicted of an offense against the United States," that provision nonetheless covers District offenders. Where § 4161 no longer operates, 18 U.S.C.

§ 3624 has taken its place; technically, it does not cover inmates in federal facilities convicted of D.C.Code offenses. See 18 U.S.C.A. §§ 3551(a) & 3621(a). Federal appellees tell us they nonetheless afford these inmates credits under the federal scheme. Brief of Federal Appellees 8 n. 6.

to Alderson, far from family, home and neighborhood. Cf. *Sullivan v. City of Cleveland Heights,* 869 F.2d 961 (6th Cir. 1989).

For purposes of choosing the degree of judicial scrutiny, the claim here differs from that in *Pitts* in two respects. First, there is an extra step in the chain that leads to the imposition of the burden. Long-term female offenders are denied benefits of the Act not "because they are women" but rather because they are not "imprisoned in a District correctional facility." In contrast to the policy attacked in *Pitts,* the statute here does not employ the concept of gender, although its interaction with the District's gender-specific prisoner-assignment rules clearly make it disadvantageous to be female. The second, related difference is that the class of prisoners burdened here also includes males. The line drawn in the Act—between those imprisoned in District facilities and those imprisoned elsewhere—does not neatly divide the sexes into winners and losers. Although this was likely also the case in *Pitts,* see *Pitts v. Meese,* 684 F.Supp. 303, 304 & n. 6 (D.D.C.1987) (noting that some male District offenders are also imprisoned away from the District), the fact was not noted in the decision and did not figure in its reasoning. Likewise, some women do benefit from the Act—those sentenced to terms of a year or less.

These factors defeat the claim to heightened scrutiny. "When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse," the Supreme Court held in *Personnel Administrator v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979), the court need inquire only into whether the law is in fact gender based, and if not, whether the disparate impact reflects a discriminatory purpose. *Feeney* upheld a state law that disadvantaged females by a two-stage process similar to that present here: it granted a public employment preference to veterans, over 98% of whom, by virtue of the enlistment policies of the armed forces, were male. (Just as Feeney could not challenge that root cause, see *id.* at 278, 99 S.Ct. at

2295–96, petitioners here cannot—in light of *Pitts*—challenge either the District's assignment system or the segregation of inmates by sex. Cf. *Johnson v. Brelje,* 521 F.Supp. 723, 728–29 (N.D.Ill.1981), *aff'd,* 701 F.2d 1201 (7th Cir.1983).) In upholding the law, the Court placed great weight on the fact that at least some women stood to benefit from the law and that many men (non-veterans) would not. *Feeney* 442 U.S. at 275, 99 S.Ct. at 2294. The same is true here; of the 2,112 D.C.Code offenders in federal facilities as of October, 1988, only 323 were women—almost a six-to-one ratio of men denied extra good time over women. See Defendants' Statement As To Which There Are No Material Facts in Dispute ¶ 2 (Oct. 24, 1988) (citing declaration of District Department of Corrections official). During the same period, approximately 150 women were serving out their sentences in D.C. prisons, and thus enjoyed the Act's benefits. *Id.* at ¶ 3. There is no hint that the legislative distinction arose from invidious purposes—hardly surprising, as it has nothing to do with sex characteristics or "archaic and stereotypic notions" of gender. See *Mississippi University,* 458 U.S. at 725, 102 S.Ct. at 3336. Thus there is no need for heightened scrutiny, and no claim that the District acted out of some improper, gender-based motive.

Still, the legislature "must support its selection of *this* group as the appropriate target for exclusion." *Plyler v. Doe,* 457 U.S. 202, 229, 102 S.Ct. 2382, 2401, 72 L.Ed.2d 786 (1982) (emphasis in original). If the denial of benefits to these petitioners is rationally related to legitimate governmental interests, it is constitutionally acceptable. See *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973). The test necessarily turns on whether the *balance* of interests differs enough with respect to the two groups—inmates in District facilities and those at Alderson—to support a disparity in treatment. See *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 447–50, 105 S.Ct. 3249, 3258–60, 87 L.Ed.2d 313 (1985) (comparing governmental interest in regulating homes for the

mentally retarded with that in regulating similar dwellings).

Two sets of governmental interests are implicated here. First is the achievement of the traditional rehabilitative, deterrent, and retributional goals of incarceration. Second is the fulfillment of the District's constitutional obligation to avoid unlawful overcrowding of its prisons.[2] The first interest is constant regardless of where a prisoner is housed; the second is not. With respect to prisoners in District facilities, the interest in easing overcrowding is clearly in play: each early release makes its contribution. The same can also be said of prisoners in state and county jails, who also receive the Act's benefits; they generally return to the District for part of their sentences, see Brief of Federal Appellees 17 n. 13, and shrinking their total time of incarceration thus may be expected to relieve District overcrowding. See *Moss v. Clark*, 886 F.2d 686, 691 n. 6 (4th Cir.1989). (At least it will do so unless they come back to the District merely to serve some specified terminal segment of their sentences, e.g., the last six months, which no one suggests to be the case.) For these two groups, the D.C. Council evidently believed that what the more generous good time provisions cost in diminished punishment was more than offset by what they supplied in reduction of overcrowding.

But with respect to the women at Alderson there was nothing to weigh. There is no suggestion that any reduction in District prisoners at Alderson would be rewarded by federal provision of additional space for male prisoners now in District facilities. (Plaintiffs do not even argue that the exclusive use of Alderson for women is an equal protection violation.) Nor are there any long-term women offenders in District facilities who might be transferred to Alderson once spots there are vacated. Petitioners are thus irrelevant to the District's overcrowding problem. As the District's interest in full sentences for petitioners is counterbalanced by precisely nothing, the distinction drawn against them is clearly rational.

## III

But plaintiffs go on to raise the rationality arguments of male prisoners in federal facilities. Because their speedy release *might* under some sets of facts help solve the District's overcrowding problem, the rationality of denying them liberalized credits is less clear, but the plaintiffs, all females, are not the proper claimants.

Just as for the female petitioners, this inquiry turns on the link between a male release and the ability of the District to secure federal places for other prisoners in (or headed toward) District facilities. In contrast to the women, however, the nature (or absence) of this link has not been established. If, for instance, the federal government has in practice allocated a given number of its own slots to District offenders, each release of a federally imprisoned male through a broader good time credit provision would allow assignment of another from a District facility. The federal release would contribute to relief of District overcrowding exactly as the release of an inmate in a District facility.

If, on the other hand, federal prison authorities are unwilling to accept any additional District offenders, regardless of how many they might hold at any given time (except as needed to prevent the District from exceeding constitutional limits on prison crowding), the distinction among males seems reasonable. Early release for the federal male inmate would in that event contribute not at all to solving the problem in District facilities. Of course, if the populations of all District prisons are capped, and if all prisons are at or over their caps, a credit for a *District* prisoner would also do the District no immediate good; it would only reduce the number of offenders going to a federal facility. In the longer run, however, the release under this circumstance would seem to lead toward ameliora-

---

**2.** The additional goal of promoting a "uniform system" for good time credits, see Preamble to the Act, 34 District of Columbia Register 484 (Jan. 23, 1987), *reprinted in* Brief of Appellant addendum at 19 and dissent at 202, does not change the analysis, as the District council plainly regarded the act's distinctions as consistent with that goal.

tion of the District's problem, at least if prisoners once assigned to federal facilities *remain* there despite reduction of District overcrowding below controlling ceilings.

If males were before us, therefore, our difficulty would be the paucity of the record, which does not fully reveal the context in which the District's legislation operates. While the relatively steady level of District prisoners in federal facilities through 1989, see Supplemental Brief of Appellants 11 n. 15,[3] may evidence a federal willingness to accept replacements almost one for one, litigation before this court suggests that federal authorities will accept a District prisoner only to avert District violation of its caps. See *United States v. District of Columbia,* 897 F.2d at 1154–55; see also Brief of Federal Appellees 28. Assuming that male challengers had been before the district court and had raised an issue of fact on the principles governing assignment of males to federal facilities—something the female prisoners have failed completely to do—a remand might be in order. See *Cosgrove v. Smith,* 697 F.2d 1125, 1133–34 (D.C.Cir.1983); but see *United States v. Crutchfield,* 893 F.2d 376, 380 (D.C.Cir.1990) ("a statutory discrimination will not be set aside if *any* state of facts reasonably may be conceived to justify it") (quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)) (emphasis added); *McGinnis v. Royster,* 410 U.S. at 270, 93 S.Ct. at 1059–60 (taking highly deferential stance towards state law's unequal award of good time credits). Of course facts that might be "conceived" but are refuted by record evidence could not sustain a distinction, but no refutation has been offered.

Because there are no male inmates before us we need not decide the rationality of the Act's distinction as it burdens them, or whether a remand might be justified. Petitioners are all female, and a "litigant has standing to challenge the constitutionality of a statute only insofar as it adversely affects h[er] own rights." *Clements v. Fashing,* 457 U.S. 957, 966 n. 3, 102 S.Ct.

2836, 2845 n. 3, 73 L.Ed.2d 508 (1982) (plurality opinion); see also *United States v. Raines,* 362 U.S. 17, 20–22, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960); *Hatch v. Reardon,* 204 U.S. 152, 160–61, 27 S.Ct. 188, 190–91, 51 L.Ed. 415 (1907). That the women inmates might possibly benefit from a judicial ruling that the Act is invalid as applied to males simply begs speculation on a remedial issue that would arise only if male prisoners succeed on the merits. This is not a case in which the third parties (the men) whose rights are being asserted suffer some impediment to doing so on their own, nor does it fall into any of the other exceptions for the basic rule that parties represent only themselves. See *Raines,* 362 U.S. at 22–23, 80 S.Ct. at 523–24. "[T]hird parties themselves usually will be the best proponents of their own rights." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976).

The rule can only increase the accuracy of judicial decisionmaking. See *Raines,* 362 U.S. at 22, 80 S.Ct. at 523 (noting objective to avoid "premature interpretations of statutes in areas where their constitutional application might be cloudy"). In this case, where female prisoners in their complaint or accompanying representations can say little more than "I was assigned to Alderson because I am a woman," male petitioners might by simply describing their individual experiences explain the interaction of the federal and District systems. This would lend a concreteness to the controversy that female plaintiffs could not possibly supply, and would likely lead to production of a proper record before the district court on the principles and practices governing male assignment. Instead, we have little more than an assertion of plaintiffs' counsel, in oral argument on the motions for summary judgment, that allocation of males as between District and federal facilities might depend on what day they happened to be sentenced, see Transcript, November 14, 1988 at 29–30, a notion they appear to advance

---

**3.** From May 1989 through January 1990 the number of District prisoners in federal custody fluctuated between 1931 and 1963. See *id.*

no longer. Though they press hard here, before the district court plaintiffs appeared to regard the males as relevant only as a more generously treated gender. See *id.* at 30.[4]

Male prisoners have in fact challenged the constitutionality of the Act as it applies to them, see *Kinston Kirk–El v. District of Columbia,* No. 89–7207 (D.C.Cir. filed, Sept. 25, 1989); *Jones v. Thornburgh,* No. 89–5267 (D.C.Cir. filed, Aug. 4, 1989); *Copeland v. District of Columbia,* No. 89–7254 (D.C.Cir. filed, Nov. 29, 1989) (held in abeyance pending the disposition of this case), and we are confident that their efforts will best develop the complex factual issues involved. If the male petitioners are successful, the women at Alderson may well profit, at least as a practical matter: it seems at least unlikely that the Council, if forced to extend the benefits to male inmates in federal custody, would not also extend them to women. But by themselves the female offenders cannot make out a constitutional violation. The judgment is

*Affirmed.*

HARRY T. EDWARDS, Circuit Judge, dissenting:

In my view, this case was not fit for disposition on summary judgment because there are genuine issues as to the material facts. Hence, the case should be remanded to the District Court for further factfinding. Accordingly, I dissent.

The appellants, thirty-one females convicted in District of Columbia ("D.C." or the "District") courts and incarcerated in federal institutions, present two challenges to the District of Columbia Good Time Credits Act of 1986, D.C.Code §§ 24–428 to 24–434 (1989) ("Act"). They claim, first, that the Act violates the equal protection clause by excluding female long-term offenders from the substantial benefit of good time credits *because* of their gender without an "exceedingly persuasive justification," *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). Next, they contend that it is irrational to dispense good time benefits randomly, or by gender, according to the building in which D.C. offenders are incarcerated. In short, the court is asked in the instant case to assess whether the Act, effected in concert with the assignment policy for D.C. offenders, is rational and gender neutral. The parties are, however, in total disagreement over the facts and policies underlying the assignment scheme; and, because the case was decided pursuant to summary judgment, the District Court did not make findings concerning these points.

Where, as here, a District Court decides a case on cross-motions for summary judgment, the court of appeals must remand when it finds "that final decision should have awaited a more complete factual development"—even if the parties purport to stipulate on appeal that the case was ripe for decision on summary judgment. *Menard v. Mitchell,* 430 F.2d 486, 488 (D.C. Cir.1970); *see also Washington Post Co. v. United States Dep't of Health & Human Servs.,* 865 F.2d 320, 326 (D.C.Cir.1989). "Before the court can apply the law, it must have an adequate factual basis for doing so." 10A C. WRIGHT, A. MILLER & M.

---

**4.** The exchange illustrates how sharply plaintiffs have changed their tune. After counsel's reference to the assignment mechanism for male prisoners, the discussion continued,

> The Court: Wait a minute. Let's not make this case any broader than it is, sir. You're talking about your clients who are all female gender persons.
> [Counsel:] I submit it's worse for them [than for the males].
> The Court: That's all you're saying. Now, your argument just alluded to, perhaps, male offenders, other offenders. It doesn't make any difference whether the female offender is sentenced on April 1st or August 1st, does it?

> [Counsel:] That's right; that is correct.
> The Court: And you say it does make a difference in terms of male offenders.

> .    .    .    .    .

> [Counsel:] That's correct.
> The Court: Well, I don't understand that, then, because that's not within the scope of your pleadings, as I understand it. We're only talking about these 13 or so female offenders in your case.
> [Counsel:] That is correct.

Transcript at 29–30.

KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 85 (1983).[1]

Facts are material if their existence or nonexistence tends to resolve any issue properly raised by the parties. "[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). With respect to the appellants' challenges to the rationality of the good time credits provision, effected in conjunction with the offender assignment process, the court must defer to the legislative classification at issue if it is rationally related to a constitutionally permissible state interest. *See e.g., McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973); *Dunn v. Blumstein*, 405 U.S. 330, 337, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972). In applying this test, the Supreme Court has made it clear that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985); *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980) (legislature may not achieve its purpose "in a patently arbitrary or irrational way"). But before we may determine whether the classification at issue here "bears some fair relationship to a legitimate public purpose," *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982), we must at least comprehend the challenged state action and the relevant characteristics of the groups to which it does and does not apply. Here, the record does not so permit.

For example, the appellants concede that a large portion of male D.C.Code offenders serve their sentences in institutions operated by the District of Columbia. *See* Brief of Appellant at 10. However, appellants claim that many male prisoners needing special protection or presenting other unspecified concerns are assigned to federal prisons, and that the federal government maintains a constant number of male D.C. offenders in federal prison. *See id.* (citing *Pitts v. Thornburgh*, 866 F.2d 1450, 1457 (D.C.Cir.1989)); Supplemental Brief of Appellant at 11 & n. 15.[2] The appellee District of Columbia rejects the latter contention, *see* Supplemental Brief of Appellees, District of Columbia at 4; and the United States contends that the federal system has accepted only males in need of special treatment and, on three "crisis" occasions, other male offenders in "substantial blocks." *See* Supplemental Brief for Fed-

1. Even in a case in which the trial court has rendered findings, the Supreme Court has made it clear that the case should be remanded to the trial court for *further* findings if there is any possibility of a factual void in the record. For example, in *Lehman v. Trout*, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984), the Supreme Court vacated the judgment and remanded to the court of appeals with instructions to remand to the District Court "for findings of fact, based on new evidence if necessary," concerning the evidentiary value of statistical evidence in an employment discrimination case. *Id.* at 1056, 104 S.Ct. at 1404. That case involved extensive factual determinations by the District Court in the trial context. As the dissent in *Lehman* noted, evidently the Supreme Court believed that "the Court of Appeals found the facts on ... two points, rather than permitting the District Court to do so in the first instance." 465 U.S. at 1059, 104 S.Ct. at 1406 (Stevens, J. dissenting). In *Pullman–Standard v. Swint*, 456 U.S. 273, 293, 102 S.Ct. 1781, 1792–93, 72 L.Ed.2d 66 (1982), the Court rejected as "incredible" an attempt by the Court of Appeals to make its own factual determinations with respect to issues on which the district court's findings were set aside for error of law.

2. One of appellants' claims is that the limited application of the Act to persons imprisoned in a District correctional facility is not rationally related to the goal of reducing overcrowding at D.C. prisons. On this point, appellants argue that, if the average sentence length of District offenders in federal prisons were reduced, the federal prison system could absorb a larger number of District prisoners. The District of Columbia contends that "[t]his theory ... is based on the false premise that the federal prison system holds a fixed number of District offenders so that federal prison spaces opened up by shorter sentences for District offenders will be filled by District offenders who otherwise would be sent to the District prison system." Supplemental Brief of Appellees, District of Columbia at 4. We have no way to determine the validity of the "premise," because the record is unclear on this point.

eral Appellees at 4 n. 2. It is unclear what percentage of male prisoners incarcerated in federal institutions is composed of "special concern" prisoners, and whether assignment to federal institutions—as opposed to assignment to D.C., state or county institutions—bears any relationship to the length of the sentence or type of offense.

The majority notes that the good time credits provision implicates two governmental purposes: (1) achievement of the traditional rehabilitative, deterrence and retributional goals of incarceration and (2) avoidance of unlawful prison crowding. The statute, however, reflects a third purpose of "promot[ing] a uniform system of awarding good time credits." [3] If the type of offense for which a male is incarcerated determines whether males are sent to federal rather than state or county institutions outside the District, then application of D.C. good time credits to one group, but not to the other, may serve the first of the cited governmental interests. But there is no obvious indication that the statute and the related assignment policy serve the second and third purposes of the statute. Indeed, as the appellants suggest, the assignment scheme may be at odds with these two purposes. There is no way we can reasonably address these contentions without some findings on the details of the assignment and prisoner transfer schemes.

As is noted in Part III of the majority opinion, the record is devoid of information concerning the availability of space for male D.C. offenders in the federal facilities and the policy concerning transfer of males between federal and D.C. facilities. This information is particularly important in light of this court's recent holding enjoining the District of Columbia "from refusing to accept into the D.C. Department of Corrections facilities newly sentenced adult male prisoners whom the Attorney General assigns to the Department, provided that the designation would not cause the District to violate court-ordered population caps or the constitutional rights of prisoners." *United States v. District of Columbia,* 897 F.2d 1152, 1156 (D.C.Cir.1990).

Similarly, while it is undisputed that males incarcerated in state and county prisons *do* receive good time credits under the Act, neither the bases for assignment nor the factors affecting the duration of the period served within the District for such offenders is evident from the record. Thus, we are in no position to speculate that early release of prisoners in state and county jails, who generally return to the District for part of their sentence, may be expected to relieve the District of overcrowding. Indeed, the United States indicates that females incarcerated in federal institutions serve out a *fixed* six-month period in the D.C. facilities just prior to release. *See* Supplemental Brief for Federal Appellees at 5 n. 3 (citing *Pitts v. Thornburgh,* 866 F.2d 1450, 1452 (D.C.Cir.1989)).

Finally, I disagree with the majority's characterization of the appellants' challenge in this case. I understand the appellants to challenge the rationality of awarding good time credits on the basis of the building in which offenders are incarcerated. *See* Supplemental Brief of Appellant at 2. Any assessment of this claim implicates all of the asserted governmental interests, and the scope of the Act's application to nonfemales may not be divorced from that assessment. *Cf. City of Cleburne,* 473 U.S. at 449–50, 105 S.Ct. at 3259–60 (considering rationality of classification in light of similarities and differences between the plaintiff group subjected to the zoning restriction and others not so restricted). Absent information about a large portion of the class affected by the good time credits provision—namely, males in federal, state and county facilities, some

---

**3.** The preamble to the Act explains that the purposes of the Act are:

[t]o promote a uniform system of awarding good time credits; to develop procedures for the administration of good time credits; to provide incentives for offenders to earn good time credits based on individual institutional adjustment, performance, and educational achievement; and to improve prison population control through the use of good time credits.

34 District of Columbia Register 484 (Jan. 23, 1987), *reprinted in* Brief of Appellant addendum at 19.

of whom receive its benefits and others who do not—the court cannot begin to evaluate whether the provision results in "uniform" sentencing or whether it will relieve crowding in the D.C. correctional facilities.

In short, although the parties appear to agree that most females receiving long-term sentences are confined in federal institutions and hence are denied the early-release benefits of the Act,[4] it is unclear whether the group of males denied the benefits is comprised of some randomly selected group of offenders with sentences greater than a year, or of a group selected on some basis related to culpability. It is also unclear whether application of the credits to males in state and county institutions serves any of the legitimate governmental goals. Such determinations are material to an assessment of the rationality of the good time credits provision.

The only thing that is clear in this case is that we do not have the information necessary to understand the very scheme we are asked to review. While the Supreme Court has suggested that it might be the court's role to hypothesize reasons to justify classifications drawn by the legislature, *see, e.g., United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), it has never been our task to hypothesize *facts* underlying the application of a statutory scheme that we are asked to review. On the record before us, it cannot seriously be maintained that "there are no disputed issues of material fact," *see Jackson v. Thornburgh,* 702 F.Supp. at 14. As the parties' arguments to this court have shown, the District Court's judgment on this point is in error. Hence, in my view, remand for further development of the factual record is required.

### CONCLUSION

We know that there are large numbers of D.C.Code offenders who are serving time in the federal system. We also know that prisoners who are convicted of exactly the same crimes, even under like circumstances, may be assigned to either a federal or D.C. correctional facility. In addition, we know that these similarly-situated persons will receive different sentences *solely* on the basis of whether they serve their time in a federal or D.C. institution. Finally, we know that male D.C.Code offenders who serve their sentences in state or county facilities outside the District of Columbia *do* receive good time credits. This scheme surely does not serve a goal of "uniform sentencing," and we cannot determine whether or how it serves the goals of rehabilitation/deterrence/retribution or avoidance of unlawful overcrowding. On its face, the good times credit provision, in concert with the disputed assignment system, seems irrational. At best, the question raised cannot be answered for lack of findings on material facts. The case should be remanded.

---

**4.** Even this point, however, does not comport with the District Court's observation that "there was uncontroverted evidence that many women sentenced to prison terms exceeding one year are, in fact, housed in the District of Columbia's city jail, where they are able to obtain the benefits of the Act." *Jackson v. Thornburgh,* 702 F.Supp. 9, 12 (D.D.C.1988).